NO FEE DUE

1    MAYA SEQUEIRA
2    msequeira@ftc.gov
3    KATHERINE WORTHMAN
     kworthman@ftc.gov
4    FEDERAL TRADE COMMISSION
5    600 Pennsylvania Avenue, N.W.
     Mail Stop: CC-6316
6    Washington, D.C.  20580
7    (202) 717-0369
     (202) 413-9773
8
9    AARON SCHUE, Cal.  Bar No. 338760
     Local Counsel
10   aschue@ftc.gov
11   FEDERAL TRADE COMMISSION
     10990 Wilshire Boulevard, Suite 400
12   Los Angeles, CA 90024
13   (310) 824-4306
     (310) 824-4380 (fax)
14
15   *Attorneys for Plaintiff*

**FILED**
CLERK, U.S. DISTRICT COURT

**11/4/24**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ mz _____ DEPUTY

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | **Case No.** 2:24-cv-09511-RGK(MAAx) |
| Plaintiff, | **COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF** |
| v. | |
| SEEK CAPITAL, LLC, a California limited liability company, also d/b/a Seek Business Capital and SBC Business; | **FILED UNDER SEAL** |
| SEEK CAPITAL, LLC, a Delaware limited liability company, also d/b/a Seek Business Capital and SBC Business; and | |
| ROY FERMAN, individually and as an officer of SEEK CAPITAL, LLC | |
| Defendants. | |

1

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1.    The FTC brings this action for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, and the Telemarketing Sales Rule, ("TSR"), 16 C.F.R. Part 310, and the Consumer Review Fairness Act of 2016 ("CRFA"), 15 U.S.C. § 45b.  For these violations, the FTC seeks relief, including a temporary, preliminary, and permanent injunction, and monetary relief pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, the TSR, 15 U.S.C § 6102(c)(1), and the CRFA, 15 U.S.C. § 45b(d)(1).

## SUMMARY OF CASE

2.    Defendants market their services to new and aspiring small business owners, promising in online advertising that they can secure for these consumers business loans or business lines of credit.  Consumers seek business loans or lines of credit so that they can buy vehicles, make payroll, buy other businesses, and pay for other expenses that require liquid funds and avoid the high interest rates and lower credit limits often associated with credit cards.  Defendants' telemarketers repeat the promises that they will obtain this type of funding.

3.    But Defendants' promises are hollow.  Defendants merely apply for multiple credit cards on behalf of individual business owners.  In doing so, Defendants ruin the individual's personal credit scores while failing to provide the business loans or lines of credit they promised.

4.    At least one bank sent Defendants a cease-and-desist letter explaining that Defendants' "credit card stacking scheme" is harmful to consumers and to the bank.  Multiple credit card issuers have a policy of denying credit card

applications they identify as having been submitted by Defendants.

5.    Most consumers are not aware that Defendants will only apply for credit cards on their behalf; instead, Defendants' claims lead them to believe they will get a business loan or line of credit.  But even consumers who catch on to Defendants' scheme and cancel their contract before Defendants submit credit card applications in their name are charged a hefty fee.

6.    Most consumers realize they've been duped only when they get Defendants' invoice and realize they've been charged 10% of the total credit card limit plus additional fees.  When consumers contact Defendants to complain and get a refund, Defendants not only refuse to make them whole but threaten to send them to collection if they do not pay.

7.    Defendants' employees have posted fake positive, five-star reviews of the Defendants' business online, and have pressured consumers into providing five-star reviews prior to receiving any services.  Defendants' contracts also contain illegal provisions that prohibit consumers from posting negative reviews of their business online.  Despite these practices, Defendants have received numerous negative reviews on websites complaining about Defendants' deceptive and unfair practices.

8.    Defendants charge consumers thousands of dollars each, taking over $37 million from consumers over the past three years.  This lucrative scheme has affected well over 5,000 consumers.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

10.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(1), (c)(2), and 15 U.S.C. § 53(b).

## PLAINTIFF

11. The FTC is an independent agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108. Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices in or affecting commerce. The FTC also enforces the CRFA, 15 U.S.C. § 45b(b)(1), which prohibits non-disparagement clauses in contracts with consumers.

## DEFENDANTS

12. Defendant Seek Capital LLC, also doing business as Seek Business Capital and SBC Business ("Seek CA"), is a limited liability company registered in California with a principal office at 6420 Wilshire Boulevard, Suites 500 and 600, Los Angeles, CA 90048. Seek CA transacts or has transacted business in this District and throughout the United States and has a call center in the Philippines. At all times relevant to this Complaint, acting alone or in concert with others, Seek CA has advertised, marketed, or offered to provide business loans and lines of credit to consumers throughout the United States.

13. Defendant Seek Capital LLC, also doing business as Seek Business Capital and SBC Business ("Seek DE"), is a limited liability company registered in Delaware with a principal office at 6420 Wilshire Boulevard, Suites 500 and 600, Los Angeles, CA 90048. Seek DE transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, Seek DE has advertised, marketed, or offered to provide business loans and lines of credit to consumers throughout the United States.

14.    Defendant Roy Ferman is the founder and Chief Executive Officer of Seek CA and Seek DE.  At all times relevant to this complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices described in this Complaint.  He has signatory authority on Seek's bank accounts, entered into contracts on Seek's behalf with third parties, trained sales representatives, edited marketing materials, and responded directly to accusations of wrongdoing from credit issuers.  Ferman resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

## COMMON ENTERPRISE

15.    Defendants Seek CA and Seek DE (collectively, "Corporate Defendants" or "Seek") have operated as a common enterprise while engaging in the deceptive, unfair, and unlawful acts and practices and other violations of law alleged below.  Corporate Defendants have conducted the business practices described below through related companies that have common ownership, officers, managers, business functions, employees, and office locations, and that have commingled funds.  Because Corporate Defendants have operated as a common enterprise, each of them is liable for the acts and practices alleged below.

## COMMERCE

16.    At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS PRACTICES

17.    Defendants prey on consumers seeking to grow or start a small business.  Since at least 2015, Defendants have run a scheme related to business loans or lines of credit, which they perpetuate through fake online reviews, and have charged thousands of consumers thousands of dollars each for their

purported business financing services.

## Defendants' "Business Loans" Operation

18.    Defendants target consumers looking for business loans or lines of credit.  Business loans and lines of credit can be used for wire transfers and to write checks directly from consumers' bank accounts to make purchases and pay expenses.  Consumers seek business loans or lines of credit so that they can buy vehicles, make payroll, buy other businesses, and pay for expenses that require liquid funds and avoid the high interest rates and lower credit limits often associated with credit cards.  Consumers are not seeking personal credit cards through Defendants as they know they can apply for those on their own, for free, and because even holding a zero balance could negatively impact their personal credit scores.

19.    Consumers often find Seek's website through its advertisements on Google, Facebook, Instagram, promotional videos on YouTube, and TikTok, and promotions on other websites.

20.    Defendants pay Google to feature their ads at the top of certain Google search results.  For example, consumers who have searched Google for a "startup business loan" have seen Defendants' advertisement near the top of the page, as shown below.  Defendants' ad claims that it is "the market leader in business loans for small business."  It advertises, "Your Business Loan in 2 Hours."

21.    Defendants have run scores of ads on Google over the last six years,
including ads that ask, "Need a Business Startup Loan?" and ads that claim,
"Instant Loan Pre-Approval…Money in 2 Hours."  More than half of these ads
use the term "loan."

22.    Defendants also pay Meta to feature its ads across Facebook,
Instagram, and Meta's other platforms.  These ads include videos of people
claiming to have been denied small business loans by "other lenders" until they
found Seek.  The ads claim that Seek was able to "pre-approve" these individuals
for funding in minutes and to get them the six-figure funding they needed for their
business in "no time" or "within a day," and with "no upfront fees."  In at least
one video an individual says that, though he was looking for $100,000, Seek got
him $150,000.

23.    Defendants' Meta and Google ads direct consumers to Seek's website,
which is replete with language about business loans and lines of credit.  On Seek's
homepage, Defendants offer consumers "Start Up Business Loans."  Consumers

who click on that link are taken to a page that advertises the "Best Startup Business Loans of 2024" and encourages them to "Apply online today." Defendants' website advertises that it is "free to apply," that approval happens "within minutes," and that "[t]his application will not affect your credit score."





24.   When consumers click the link on Seek's homepage that reads "Small Business Loans" they are taken to a page that advertises the "10 Best Small Business Loans up to $500,000," and lists, among others, SBA (Small Business Administration) Loans, Business Startup Loans, and Business Lines of Credit. Right below this ad consumers are invited to "Apply online today." Defendants also advertise that approval for funding happens "within minutes."

25.    Scrolling down this page takes consumers to a section on Business Lines of Credit.  Defendants write: "A Business Line of Credit… gives you access to a preapproved source of funds that you can draw on whenever you want. You'll only repay the amount that you've borrowed."



**Business Line of Credit**

**All You Need to Know About Business Lines of Credit**

Imagine having a super healthy cousin who's also very giving. Whenever you want, you can walk over to them and say, "Hey buddy, can I borrow $5,000?," and they'll say yes. Of course, you're going to pay back whatever you borrow, but you can ask anytime you want, and the answer will always be yes.

A business line of credit is like your philanthropic cousin. It gives you access to a pre-approved source of funds that you can draw on whenever you want. You'll only repay the amount that you've borrowed, and the rest of it waits, ready to be borrowed when you need it.

26.    Defendants make similar claims on other websites, operated by lead generators.  Defendants provide lead generators with information promoting Seek on their websites.  For example, in one instance, Defendant Roy Ferman specifically told a lead generator's marketing team that Seek offers "startup business loans."  When the lead generator asked for specific information to market

the loan product, Seek's VP of Product & Marketing replied that the loan amount was $10,000-$250,000 and the term was an "Open Line of Credit." Under "details," he added that consumers could "get preapproved in minutes" and that there was "No Hard Credit Pull."

27.    Defendants have also reviewed and approved statements on lead generator websites advertising that Seek provides lines of credit. For example, the below promotion says that Seek offers "Open Line[s] of Credit." It lists a "Loan amount range" of $10,000 to $250,000, and an introductory APR of 0% for 12 months. Under "About the Lender," it states that Seek "specializes in providing funding for startups & early stage business owners" and advertises "Get pre-approved within minutes." Defendant Ferman approved this promotion.



28.    These websites prompt consumers to provide certain information such as the amount of funding they are seeking, how long their business has been in operation, the business's estimated revenue, and the consumers' approximate credit score. The lead generator then sells this information to Defendants.

29.    Defendants have contracts with multiple lead generators. The contracts provide that Seek pays the lead generator between $2.50 and $15.50, depending on the consumer's credit score, for information about each consumer

inquiring about business funds between $25,000 and $500,000. These contracts are signed by Defendant Ferman.

30. Defendants' application on both their own website and on the lead generator sites asks questions like how long the consumer has been in business, what the consumer needs funds for, how much they need, and their credit score. After they answer these questions, many consumers receive both emails and a call from Seek representatives.

31. At various times, Defendants' initial email to consumers has read, "Congratulations! Our team has reviewed your file and you have been PRE-APPROVED. The Senior Funding Advisor assigned to your file will contact you," and "we've received your request and will contact you shortly to discuss your pre-approval! Who is Seek Capital… **Expert Funding Advisors**--real people here to help tailor funding to **your individual business needs**" (emphasis in original). Defendants' emails explain "How it Works": "We work with our partners to secure the best type of funding for your business" and "Get the funds you need deposited in your account in approximately two weeks." Defendants claim in these emails to help the consumer take advantage of "fast online loans with authorized lenders only."

### *Seek's Telemarketing*

32. Defendants' sales process continues through a telephone call with consumers. Most often, Defendants' telemarketers call consumers in response to an online inquiry; occasionally, consumers call Seek after seeing one of Defendants' advertisements.

33. On the call, consumers typically explain to Defendants' telemarketers the nature of their business and why they are seeking access to cash. Some consumers have explained to Defendants' telemarketers that they need cash to

purchase large expenses, such as a building or vehicle for their business. Other consumers have made clear to Defendants' telemarketers that they needed money to pay rent or make payroll or other expenses for which one cannot use a credit card. Defendants' telemarketers often tell consumers that the company has expertise in funding the very type of business that the consumer is engaged in. For example, Defendants have connected consumers looking to start trucking businesses with a so-called "trucking specialist." Defendants' telemarketers also frequently represent that the company specializes in funding startup businesses.

34.    Defendants' telemarketers stress to consumers they can secure business loans, business funding, and business lines of credit. Telemarketers tell consumers that in order to approve them for funding, Defendants' "underwriters" need to check the business owner's credit score and that they need the owner's Social Security number to do a "soft pull" of their credit report.

35.    Defendants' telemarketers tell consumers with lower credit scores— consumers Defendants have targeted through lead generators—that Defendants cannot help them unless they can find a "co-signer" with a higher credit score to apply for the loan. Seek has estimated that these co-signers constitute 20% of its customers.

36.    Defendants' telemarketers also tell consumers that Seek has special relationships with lenders. Defendants train their telemarketers to tell consumers that working with Seek gives consumers access to programs not available to the general public as well as to dedicated bank representatives, resulting in, on average, 25% higher "approvals" than applying for credit on their own.

37.    When consumers have used the word "loan" to describe the product they are seeking, Defendants' telemarketers have not distinguished Defendants' service as offering something different. This is the case even when consumers explain that they need cash or "hard money" for large purchases like property or a

vehicle for their business.

38.    When consumers have pressed Defendants' telemarketers on whether the funding Defendants are offering is in the form of a loan, the telemarketers have told consumers that any business that has been open less than two years would not be able to get a traditional bank loan, but that Defendants can get them funding via a line of credit.  Defendants' telemarketers also often affirmatively tell consumers that Defendants can secure for them a line of credit.  Defendants' telemarketers explain that a line of credit will give consumers access to cash, checks, and/or money wires.

39.    If asked if the line of credit is like a credit card, Defendants' telemarketers have responded "no."  Defendants' telemarketers have stated that even though the "line of credit" is attached to a credit card, consumers will have access to "cold hard cash or checks or wires."

40.    In some instances where there is a discussion of credit cards, Defendants' telemarketers tell consumers the credit cards will have low interest rates such as 0% APR for 18 or 24 months.  Defendants' telemarketers also tell consumers that they will secure for them more money than requested—sometimes tens of thousands of dollars more.

41.    Defendants' telemarketers also tell consumers that Defendants charge no upfront fees, that any fees are "results based," and that consumers incur no costs until funding is approved.  Defendants have confirmed this representation in their response to a BBB complaint: "Seek Capital works with national and regional banks to help match users to the most suitable funding partners and ONLY receives a commission upon completion of services.  Seek Capital charges no upfront fees."

42.    While on the phone with consumers, Defendants' telemarketers send them, via DocuSign, a contract Defendants call a Funding Estimate Agreement

("Funding Contract").

43.    Defendants often pressure consumers to sign the document right away, before ending the phone call.  For example, one consumer recalls Defendants' telemarketer discouraging him from taking the time to review the Funding Contract.  The consumer explained to the telemarketer that he could not complete the DocuSign right away because he was driving and so could not review the paperwork.  The telemarketer told him that he didn't need to review anything, he could just sign the document since the telemarketer had already explained the financing.  Another consumer asked Defendants' telemarketer to email her the agreement to read before signing.  The representative said that there wasn't time for that, and that the consumer would lose the financing if she didn't sign immediately.

44.    For those consumers who end the call before signing the Funding Contract, Defendants call them repeatedly until they sign.  Consumers have described the calls pressuring them to sign as "incessant" and "harassing."

45.    The Funding Contract includes four pages of single-spaced small-font paragraphs, with 22 places for consumers to initial, and a final signature page. When consumers open the contract, they are automatically taken to the first place they sign or initial, which appears on page two.  If they were to manually go back to page one, they would see the term "Credit Cards with Line of Credit Capability," which reiterates Defendants' claim that they will seek lines of credit for consumers.  The contract also states "NO UPFRONT FEES" in bold font in the first page, and again on the page preceding the consumers' final signature. Only in smaller font, between the "NO UPFRONT FEES" claims does the contract mention early termination fees.  This fee is not mentioned on sales calls.

46.    Soon after signing the Funding Contract, Defendants also pressure consumers into signing another document to submit "credit and loan applications"

on the consumer's behalf.  This document lists various "credit and loan facilities,"
including business and personal credit cards, bank lines of credit, and bank loans.
Even if any consumer noticed the language, consumers would expect that Seek
would only apply for business loans or lines of credit, as promised.

47.    Defendants typically schedule a second "verification" call with
consumers 48 hours after the consumer signs the Funding Contract.  On this call,
Defendants gather consumer financial information including information about the
consumers' current debts, bank accounts, credit cards, and income.

48.    If, during this second call, consumers raise doubts about Seek's
services and decide they do not want to move forward, Defendants' telemarketers
often tell them that it is too late to cancel, even though Defendants have neither
submitted any application nor obtained any loans or lines of credit on the
consumer's behalf.

49.    Defendants' telemarketers have also encouraged consumers seeking to
cancel after the second call to "give it a day" before they make up their mind.
Asking consumers to wait to cancel increases the fees Defendants collect before
securing any funding, as Defendants charge a $495 "Early Termination Fee" if
consumers cancel within 48 hours of signing the Funding Contract or $995 if at
least 48 hours have passed.  Many consumers first learn of these fees when they
seek to cancel, or when they receive Seek's invoice asserting they owe the Early
Termination Fee.

50.    During or immediately after this call, Defendants send consumers a
pre-filled "Verification and Compliance Questionnaire" ("VCQ") for their
signature, pressuring them to sign by telling them that Seek's process is "time-
sensitive."  Above the signature line, the document states that the consumer
confirms and acknowledges the funding estimate range, that the type of funding is
unsecured credit cards with line of credit capability, and that documents the

15

consumer has provided are accurate.  Consumers who see this language would thus expect to be able to use the funding like a line of credit.  The VCQ also states that there are no upfront fees above a second signature line, and only mentions termination fees once, buried amongst the 18 paragraphs consumers initial.  Many of the terms are copied directly from the Funding Contract such that the questionnaire's terms incorrectly refer to "this Funding Estimate Agreement."  As a result, the document appears to be another iteration of a document that consumers have already signed promising a line of credit.

51.    Consumers do not negotiate the terms of the VCQ.  Like the Funding Contract, the VCQ is a form contract sent to all consumers.  The VCQ contains a clause that prohibits consumers from causing harm to Seek's reputation, specifically from posting online any negative comments, reviews, or complaints about Seek for three years.  Such clauses are prohibited by federal law.

### Seek's Application for Credit Cards

52.    Once consumers sign the VCQ, Defendants begin submitting credit card applications to multiple credit card issuers, the overwhelming majority of which are for personal credit cards.  Defendants do not submit applications for business loans or lines of credit.  Defendants then charge consumers 10% of the total approved credit card limits plus additional fees.  This amounts to thousands of dollars per consumer.

53.    For those consumers who Defendants have insisted need "co-signers," to obtain a business loan or line of credit, Defendants apply for credit cards on behalf of those co-signers without their knowledge or authorization, ruining the co-signer's personal credit and falsely associating the co-signer with the initial consumer's business.

54.    Small business owners have complained that after convincing them that they need a co-signer for a business loan, Seek applied for credit cards—

including business credit cards—solely in the name of the spouse or parent who agreed to co-sign, even though the co-signer was not associated with the business. One co-signer reported that when he contacted banks to cancel the credit cards Defendants had applied for in his name, he saw at least one credit card application on which Defendants had listed him as an owner of his son's company. He was in no way associated with the business.

55. Consumers never see, sign, or approve any credit card applications that Defendants submit on their behalf. In fact, the first time many consumers learn that Defendants have applied for credit cards in their name is when they receive one or more of the following: (1) an alert that there has been a decline in their credit score, (2) an invoice from Defendants listing the credit cards Defendants have obtained for the consumer and the amount Defendants claim consumers owe them, or (3) a credit card approval or denial letter from a bank. This is also often the first time that many consumers learn that they are paying fees for credit cards, and that they are required to pay fees regardless of the credit secured, such as an application fee.

56.    Below is an example of Defendants' invoice, including the fees Defendants have charged for numerous individual credit card applications:

**seek business capital**

**INVOICE**

USA

**Invoice Date**
15 Mar 2022

**Invoice Number**
INV-21151

**Rep Code**
ULOC-BL

Seek Capital
Attention: Account Receivables
6420 Wilshire Blvd, Ste 500
LOS ANGELES CA 90048
USA

| Description | Quantity | Billing Rate | Amount USD |
|---|---|---|---|
| Discover - It Chrome | 1,000.00 | 0.0999 | 99.90 |
| Capital One - Venture One | 40,000.00 | 0.0999 | 3,996.00 |
| BofA - Travel Rewards | 17,000.00 | 0.0999 | 1,698.30 |
| Chase - Freedom Flex | 7,300.00 | 0.0999 | 729.27 |
| Chase - Ink Business Unlimited | 9,000.00 | 0.0999 | 899.10 |
| Bank of Texas - Platinum | 25,000.00 | 0.0999 | 2,497.50 |
| Amex - Blue Business Card | 2,000.00 | 0.0999 | 199.80 |
| Amex - Gold Delta Skymiles | 3,000.00 | 0.0999 | 299.70 |
| Envision Bank-Platinum | 25,000.00 | 0.0999 | 2,497.50 |
| Bank Negotiation Fee | 1.00 | 595.00 | 595.00 |
| Application Fee | 1.00 | 795.00 | 795.00 |
| | | Subtotal | 14,307.07 |
| | | Invoice Total USD | 14,307.07 |
| | | Total Net Payments USD | 0.00 |
| | | **Amount Due USD** | **14,307.07** |

57.    Consumers often don't have the money to pay Defendants' fees. In these cases, Defendants have suggested consumers charge the fee to one of the credit cards Defendants secured without the consumers' authorization.

58.    When consumers refuse to pay Defendants' invoice, Defendants often threaten to send consumers to collections.

59.    Defendants also have inflated consumers' income and made other false statements on credit card applications to increase the total credit limit for

which a consumer is likely to be approved, and in turn increase Defendants' fees.

60.    Because consumers do not see the credit card applications Defendants submit on their behalf, they are unaware that Defendants include false information on the applications.

61.    Defendants' false statements cause banks to extend to consumers more credit than they would otherwise deem appropriate, which in turn increases the amount that Defendants charge consumers.

### *Defendants' Representations Are False*

62.    As consumers eventually learn, Defendants never apply for business loans or lines of credit on their behalf.  Defendants do not offer consumers tailored funding solutions or have any underwriting process that enables them to approve or pre-approve consumers for any type of funding.  Defendants also do not offer any credit card that has "line of credit capability."  In fact, Defendants provide their telemarketers scripts for their calls with consumers and train their telemarketers not to mention that Defendants only apply for (mostly personal) credit cards on behalf of small business owners.

63.    Without consumers' authorization, Defendants use consumers' personal information to apply for mostly personal credit cards that consumers could have applied for on their own.

64.    Defendants often apply for more credit than consumers expressed to Defendants that they wanted.  A former Seek employee reported that Defendants' practice is to apply for credit cards with available credit equaling 125% of the consumers' requested loan amount, which in turn increases Defendants' 10% fee.

65.    Defendants do not have special relationships with lenders that benefit consumers in search of business loans or business lines of credit.  On the contrary, in late 2022, First National Bank of Omaha ("FNBO") sent a cease-and-desist

letter to Defendants, demanding that Seek immediately stop applying on behalf of consumers for FNBO credit cards.

66.    Other credit issuers flag applications submitted by Seek for additional scrutiny.  When one consumer called U.S. Bank after being surprised to learn that Defendants had applied for a credit card there on his behalf, the U.S. Bank representative explained that the bank had warned Seek that regulations prevent predatory companies from applying for credit cards under other people's names without those individuals' consent and that U.S. Bank would need to confirm consent with the applicant.  When another consumer asked a U.S. Bank representative if she knew about Seek, the representative said that the bank knew all about Seek and that when the bank is aware that Seek was applying for a credit card on someone else's behalf, they deny the application.

67.    Also, for the subset of consumers who learn in advance that some funding will be from credit cards, Defendants often fail to obtain for consumers the specific financing terms, such as 0% APR for 18 or 24 months, they promised. For example:

- Defendants told one consumer that they would apply for credit cards that had a 0% APR for 24 months.  But of the 12 credit cards that Seek secured for the consumer, many did not have a 12-month 0% APR and none of the credit cards had a 0% APR for 24 months.

- Defendants told another consumer that they would obtain credit cards that were "interest free" for the first 12 months.  Out of the four credit cards that Seek obtained for the consumer, two were not interest free for the first 12 months.

68.    Defendants' submission of numerous credit card applications on consumers' behalf also results in lowering consumers' credit scores.  For example:

- Defendants' credit card applications caused multiple consumers' credit

scores to drop approximately 200 points, from the 800s to the 600s.

- One consumer who suffered a 160-point drop in her credit score as a result of Defendants' credit card applications reported that one year later, her credit score had not recovered.

69.    As a result of Defendants' business loan scam, consumers have paid Defendants tens of millions of dollars in fees for services they never received. Defendants' actions have caused some consumers to fall into credit card debt, Defendants have sent other consumers to collections, and for many consumers, Defendants' credit card applications have made it more difficult to obtain the loans they needed to start or grow their businesses.  As a result, some consumers have abandoned those plans or dissolved their businesses.  One consumer who was forced to split Defendants' more than $11,000 bill over two credit cards explained: "I am still paying the balance on the credit cards to this day. Furthermore, because of Seek's deceiving practices, I almost went out of business… My business plan got stalled and I did not expand my company as planned… My credit has still not recovered even though it has been almost one year.  Seek did not provide the service that it promised.  If I had known Seek would only apply for credit cards, I would have never signed up with Seek.  I could have easily obtained these credit cards myself for free."

### *Misleading Consumer Review Practices*

70.    Defendants' employees post fake, positive reviews of Seek's services on third-party websites.  Defendants also pressure consumers to write positive reviews of Seek's service, with 5-star ratings, before any service has been performed.  For example:

71.    Consumers looking for information about Seek are misled by Defendants' practices.  For example, a recent deluge of 5-star reviews bury 1-star reviews from consumers warning that the business is a scam.

**Ongoing Conduct**

72.    Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.  Defendants have engaged in their unlawful acts and practices repeatedly over a period of at least nine years.  Defendants continued to engage in the conduct at issue in this Complaint even after financial institutions warned them of potential law violations and sought to cease any dealings with Defendants, and Defendants received hundreds of consumer complaints regarding their numerous misrepresentations.

**VIOLATIONS OF THE FTC ACT**

73.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

74.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.  Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or

competition.  15 U.S.C. § 45(n).

**Count I**

**Misrepresentations Regarding Business Financing Services**

75.   In numerous instances in connection with the advertising, marketing, or offering of business financing services, Defendants have represented, directly or indirectly, expressly or by implication, that:

    a.    Defendants obtain business loans or business lines of credit for consumers;

    b.    Defendants have relationships with lenders;

    c.    Defendants offer credit cards with line of credit capability;

    d.    Defendants offer specific financing terms, like 0% APR for 18 or 24 months;

    e.    Defendants charge no fees until funding; and

    f.    Defendants' applications will not harm consumers' credit scores.

76.   Defendants' representations as described in Paragraph 75 are false or misleading or were not substantiated at the time the representations were made.

77.   Therefore, Defendants' representations as described in Paragraph 75 constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count II**

**Deceptive Fee and Billing Practices**

78.   In numerous instances in connection with the advertising, marketing, or offering of business financing services, Defendants have represented, directly or indirectly, expressly or by implication, that consumers have authorized the charges on their invoices.

79.   Defendants' representations as described in Paragraph 78 are false or

23

misleading or were not substantiated at the time the representations were made.

80.    Therefore, Defendants' representations as described in Paragraph 78 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count III

## Unfair Fee and Billing Practices

81.    In numerous instances, Defendants have billed consumers for fees for which consumers have not provided express, informed consent.

82.    Defendants' acts or practices as described in Paragraph 81 have caused or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

83.    Therefore, Defendants' acts or practices as described in Paragraph 81 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a) and (n).

## Count IV

## Deceptive Consumer Review Practices

84.    In numerous instances in connection with the advertising, marketing, or offering of business financing services, Defendants have represented, directly or indirectly, expressly or by implication, that reviews of Seek were truthful reviews by actual users of Defendants' services.

85.    Defendants' representations as described in Paragraph 84 are false or misleading or were not substantiated at the time the representations were made.

86.    Therefore, Defendants' representations as described in Paragraph 84 constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

# VIOLATIONS OF THE TELEMARKETING SALES RULE

87.    In 1994, Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101- 6108.  The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter.  *See* 16 C.F.R. Part 310.

88.    Under the TSR, "telemarketing" is a "plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call."  16 C.F.R. § 310.2(hh).  A "telemarketer" is "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor."  16 C.F.R. § 310.2(gg).  An "outbound telephone call" is "a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution."  16 C.F.R. § 310.2(x).  A "seller" is "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration."  16 C.F.R. § 310.2(ee).

89.    Defendants are "seller[s]" or "telemarketer[s]" engaged in "telemarketing," as those terms are defined in the TSR, 16 C.F.R. § 310.2(ee), (gg), and (hh).

90.    The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer.  16 C.F.R. § 310.3(a)(2)(iii).

91.    Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, a violation of the TSR constitutes

an unfair or deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT V

### Deceptive Telemarketing Acts or Practices

92.    In numerous instances, in connection with the telemarketing of business financing services, Defendants have misrepresented, directly or indirectly, expressly or by implication, material information regarding Seek's services, including, but not limited to:

      a.    Defendants obtain business loans or business lines of credit for consumers;

      b.    Defendants have relationships with lenders;

      c.    Defendants offer credit cards with line of credit capability;

      d.    Defendants offer specific financing terms, like 0% APR for 18 or 24 months;

      e.    Defendants charge no fees until funding; and

      f.    Defendants' applications will not harm consumers' credit scores.

93.    Therefore, Defendants' acts or practices as described in Paragraph 92 violate the TSR, 16 C.F.R. § 310.3(a)(2)(iii), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### VIOLATION OF THE CONSUMER REVIEW FAIRNESS ACT

94.    The CRFA, P.L.  114-258, 15 U.S.C. § 45b, was enacted on December 14, 2016.  As of March 14, 2017, Section 2(b) of the CRFA renders void, and Section 2(c) of the CRFA prohibits the offering of, provisions in form contracts that: prohibit or restrict the ability of an individual consumer who is a party to the form contract to engage in a covered communication; or that impose a penalty or fee against individual consumers who engage in such communications.

26

15 U.S.C. §§ 45b(a)(2), 45b(b)(1), and 45b(c).

95.   The CRFA defines "form contract" to mean "a contract with standardized terms (i) used by a person in the course of selling or leasing the person's goods or services; and (ii) imposed on an individual without a meaningful opportunity for such individual to negotiate the standardized terms." 15 U.S.C. §§ 45b(a)(3).  The CRFA defines "covered communication" as "a written, oral, or pictorial review, performance assessment of, or other similar analysis of, including by electronic means, the goods, services, or conduct of a person by an individual who is party to a form contract with respect to which such person is also a party."  15 U.S.C. §§ 45b(a)(2).

96.   The Commission is authorized to enforce Section 2(c) of the CRFA in the same manner, by the same means, and with the same jurisdiction, powers, and duties as though all applicable terms and provisions of the Federal Trade Commission Act, 15 U.S.C. §§ 41-58, were incorporated into and made a part of the CRFA.  15 U.S.C. § 45b(d)(2)(A).  The Commission's enforcement authority under the CRFA applies to contracts in effect on or after December 14, 2017.  15 U.S.C. § 45b(i)(2).

97.   Pursuant to 15 U.S.C. § 45b(d)(1), a violation of 15 U.S.C. § 45b(c) shall be treated as a violation of a rule defining an unfair or deceptive act or practice prescribed under Section 18(a)(1)(B) of the FTC Act, 15 U.S.C. § 57a(a)(1)(B).

**COUNT VI**

**Unlawful Contract Terms**

98.   In numerous instances, including as described in Paragraph 51, Defendants have offered, in the course of selling their services, form contracts containing provisions that prohibit or restrict the ability of an individual who is a party to the form contract to engage in a covered communication.

99.    Therefore, Defendants have violated the CRFA, 15 U.S.C. § 45b(c).

## CONSUMER INJURY

100.  Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the TSR, and the CRFA.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests that the Court:

A.    Enter a permanent injunction to prevent future violations of the FTC Act, TSR, and CRFA;

B.    Grant preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including temporary and preliminary injunctions, an order freezing assets, immediate access to Corporate Defendants' premises, and appointment of a receiver;

C.    Award monetary and other relief within the Court's power to grant, including the rescission or reformation of contracts, the refund of money, public notification, or other relief necessary to redress injury to consumers; and

D.    Award any additional relief as the Court determines to be just and proper.

///

///

///

///

///

///

1

2

3    Dated: 11/4/24

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Respectfully submitted,

MAYA SEQUEIRA
msequeira@ftc.gov
202-717-0369
KATHERINE WORTHMAN
kworthman@ftc.gov
(202) 413-9773
FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Mail Stop: CC-6316
Washington, D.C.  20580

AARON SCHUE, Cal.  Bar No. 338760
Local Counsel
aschue@ftc.gov
FEDERAL TRADE COMMISSION
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
(310) 824-4306
(310) 824-4380 (fax)

Attorneys for Plaintiff