MAYA SEQUEIRA (pro hac vice)
msequeira@ftc.gov
(202) 326-3719
KATHERINE WORTHMAN (pro hac vice)
kworthman@ftc.gov
(202) 326-2929
JULIA HEALD, (pro hac vice)
jheald@ftc.gov
(202) 326-3589
SALLY TIEU, Cal. Bar No. 346034
stieu@ftc.gov
(202) 304-7313
FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Mail stop CC-10232
Washington, D.C. 20580

AARON SCHUE, Cal. Bar No. 338760
Local Counsel
aschue@ftc.gov
(310) 824-4306
FEDERAL TRADE COMMISSION
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
*Attorneys for Plaintiff*

**JS6**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | 2:24-cv-09511-RGK-MAA |
| Plaintiff, | CASE NO. ~~24-cv-09511-RGK~~ |
| v. | |
| **SEEK CAPITAL, LLC**, et al., | **STIPULATED ~~[PROPOSED]~~ ORDER FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF** |
| Defendants. | |

**[142]**

Plaintiff, the Federal Trade Commission ("Commission" or "FTC"), filed its Complaint for Permanent Injunction, Monetary Judgment, and Other Relief in this matter, pursuant to Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) & 57b.  The Commission and Defendants stipulate to the entry of this Order for Permanent Injunction, Monetary Judgment, and Other Relief ("Order") to resolve all matters in dispute in this action between them.

THEREFORE, IT IS ORDERED as follows:

## FINDINGS

1.    This Court has jurisdiction over the subject matter of this case.

2.    The Complaint charges that Defendants have participated in unfair and deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, and conduct that violates the Consumer Review Fairness Act of 2016 ("CRFA"), 15 U.S.C. § 45b(b)(1).

3.    Defendants violated Section 5 of the FTC Act, 15 U.S.C. § 45(a) and (n), the TSR, 16 C.F.R. Part 310, and the CRFA, 15 U.S.C. § 45b(b)(1), in connection with business financing services, as set forth in Exhibit A.

4.    Defendants waive any claim that they may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agree to bear their own costs and attorney fees.

5.    Defendants and the Commission waive all rights to appeal or otherwise challenge or contest the validity of this Order.

## DEFINITIONS

For purposes of this Order, the following definitions shall apply:

A. "**Asset**" means any legal or equitable interest in, right to, or claim to, any

property, wherever located and by whomever held.

B. **"Clear(ly) and conspicuous(ly)"** means that a required disclosure is easily noticeable (i.e., difficult to miss) and easily understandable by ordinary Consumers, including in all of the following ways:

1. In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented. In any communication made through both visual and audible means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

2. A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

3. An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary Consumers to easily hear and understand it.

4. In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

5. The disclosure must use diction and syntax understandable to ordinary Consumers and must appear in each language in which the representation that requires the disclosure appears.

6. The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

7. The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

8. When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary Consumers" includes members of that group.

C. **"Credit Repair Product or Service"** means any product or service represented, expressly or by implication to: (1) improve any Consumer's credit report, credit record, credit history, credit profile, credit score, or credit rating; or (2) provide advice or assistance to any Consumer with regard to any activity or service the purpose of which is to improve a Consumer's credit report, credit record, credit history, credit profile, credit score or credit rating.

D. "**Consumer**" means a natural person, an organization or other legal entity, including a corporation, partnership, sole proprietorship, limited liability company, association, cooperative, or any other group or combination acting as an entity.

E. "**Corporate Defendant(s)**" means Seek Capital, LLC, a Delaware limited liability company, Seek Capital, LLC, a California limited liability company, doing business as Seek Business Capital and SBC Business, and each of their subsidiaries, affiliates, successors, and assigns.

F. "**Covered Products and Services**" means any product, service, plan, or program represented, expressly or by implication, to: provide any Consumer, arrange for any Consumer to receive, or assist any Consumer in receiving, directly or indirectly, funding, loans, lines of credit, or credit cards.

G. "**Defendants**" means Corporate Defendants and Individual Defendant, individually, collectively, or in any combination.

H. "**Express Informed Consent**" means an affirmative act communicating unambiguous assent to be charged, made after receiving and in close proximity to a Clear and Conspicuous disclosure of all material information related to the charge.

I. "**Individual Defendant**" means Roy Ferman.

J. "**Secured or Unsecured Debt Relief Product or Service**" means:

    a. With respect to any mortgage, loan, debt, or obligation between a person and one or more secured or unsecured creditors or debt collectors, any product, service, plan, or program represented, expressly or by implication, to:

        i. stop, prevent, or postpone any mortgage or deed of foreclosure sale for a person's dwelling, any other sale of collateral, any repossession of a person's dwelling or other collateral, or otherwise save a person's dwelling or other collateral from foreclosure or repossession;

        ii. negotiate, obtain, or arrange a modification, or renegotiate, settle, reduce, or in any way alter any terms of the mortgage, loan, debt, or obligation, including a reduction in the amount of interest, principal balance, monthly payments, or fees owed by a person to a secured or unsecured creditor or debt collector;

        iii. obtain any forbearance or modification in the timing of payments from any secured or unsecured holder or servicer of any mortgage, loan, debt, or obligation;

        iv. negotiate, obtain, or arrange any extension of the period of time within which a person may (i) cure his or her default on the mortgage, loan, debt, or obligation, (ii) reinstate his or her mortgage, loan, debt, or obligation, (iii) redeem a dwelling or other collateral, or (iv) exercise any right to reinstate the mortgage, loan, debt, or obligation or redeem a dwelling or other collateral;

        v. obtain any waiver of an acceleration clause or balloon payment contained in any promissory note or contract secured by any

dwelling or other collateral; or

vi. negotiate, obtain, or arrange (i) a short sale of a dwelling or other collateral, (ii) a deed-in-lieu of foreclosure, or (iii) any other disposition of a mortgage, loan, debt, or obligation other than a sale to a third party that is not the secured or unsecured loan holder;

The foregoing shall include any manner of claimed assistance, including auditing or examining a person's application for the mortgage, loan, debt, or obligation.

b. With respect to any loan, debt, or obligation between a person and one or more unsecured creditors or debt collectors, any product, service, plan, or program represented, expressly or by implication, to: a. repay one or more unsecured loans, debts, or obligations; or b. combine unsecured loans, debts, or obligations into one or more new loans, debts, or obligations

K. "**Telemarketing**" means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call. The term does not include the solicitation of sales through the mailing of a catalog which: contains a written description or illustration of the goods or services offered for sale; includes the business address of the seller; includes multiple pages of written material or illustrations; and has been issued not less frequently than once a year, when the person making the solicitation does not solicit customers by telephone but only receives calls initiated by customers in response to the catalog and during those calls takes orders only without further solicitation.  For purposes of the previous sentence, the term "further solicitation" does not include providing the customer with information about, or

attempting to sell, any other item included in the same catalog which prompted the customer's call or in a substantially similar catalog.

## ORDER

### I. BAN ON COVERED PRODUCTS AND SERVICES

IT IS ORDERED that Defendants are permanently restrained and enjoined from advertising, marketing, promoting, or offering for sale, or assisting in the advertising, marketing, promoting, or offering for sale Covered Products and Services.

### II. BAN ON SECURED AND UNSECURED DEBT RELIEF PRODUCTS AND SERVICES

IT IS THEREFORE ORDERED that Defendants, whether acting directly or indirectly, are permanently restrained and enjoined from:

A. Advertising, marketing, promoting, offering for sale, or selling any Secured or Unsecured Debt Relief Product or Service; and

B. Assisting others in the advertising, marketing, promoting, offering for sale, or selling any Secured or Unsecured Debt Relief Product or Service.

### III. BAN ON CREDIT REPAIR

IT IS THEREFORE ORDERED that Settling Defendants, whether acting directly or indirectly, are permanently restrained and enjoined from:

A. Advertising, marketing, promoting, offering for sale, or selling any Credit Repair Service; and

B. Assisting others in the advertising, marketing, promoting, offering for sale, or selling any Credit Repair Service.

### IV. PROHIBITION AGAINST MISREPRESENTATIONS

IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly

or indirectly, in connection with the advertising, marketing, promoting, or offering
for sale of any goods or services, are permanently restrained and enjoined from
misrepresenting expressly or by implication:

    A. that Defendants are affiliated with a business or a type of business;

    B. that Defendants' services will not harm Consumers' credit scores

    C. that Defendants charge no upfront fees;

    D. that Consumers have authorized the charges on their invoice;

    E. that reviews of Seek were truthful reviews by actual users of
Defendants' services; and

    F. any other fact material to Consumers concerning any good or service
such as the total costs; any material restrictions, limitations, or conditions;
or any material aspect of its performance, efficacy, nature, or central
characteristics.

## V. PROHIBITION ON TELEMARKETING

IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents,
employees, and attorneys, and all other persons in active concert or participation
with any of them, who receive actual notice of this Order, whether acting directly
or indirectly, in connection with Telemarketing of any goods or services, are
permanently restrained and enjoined from violating any provision of the TSR, 16
C.F.R. Part 310, attached as Attachment B.

## VI. PROHIBITION AGAINST UNAUTHORIZED CHARGES

IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents,
employees, and attorneys, and all other persons in active concert or participation
with any of them, who receive actual notice of this Order by personal service or
otherwise, whether acting directly or indirectly, in connection with the advertising,
marketing, promoting, or offering for sale of any goods or services, are
permanently restrained and enjoined from billing Consumers for any charges

without having previously obtained Express Informed Consent, and having created
and maintained a record of such consent.

## VII. PROHIBITION AGAINST UNLAWFUL CONTRACT TERMS

IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents,
employees, and attorneys, and all other persons in active concert or participation
with any of them, who receive actual notice of this Order by personal service or
otherwise, whether acting directly or indirectly, in connection with the advertising,
marketing, promoting, or offering for sale of any goods or services, are
permanently restrained and enjoined from prohibiting or restricting any Consumer,
potential purchaser, or investor from communicating reviews, performance
assessments, and similar analyses about Defendants' products or services, or the
conduct of Defendants; or threatening or imposing a penalty or fee against any
Consumer, potential purchaser, or investor who engages in such communications.

## VIII. COOPERATION

IT IS FURTHER ORDERED that:

Defendants must cooperate with representatives of the Commission in this
case and in any investigation related to or associated with the transactions or
occurrences that are the subject of the Complaint. Defendants must provide truthful
and complete information, evidence, and testimony. Defendants must appear for
interviews, discovery, hearings, trials, and any other proceedings that a
Commission representative may reasonably request upon 5 days' written notice, or
other reasonable notice, at such places and times as a Commission representative
may designate, without the service of a subpoena.

## IX. MONETARY JUDGMENT AND PARTIAL SUSPENSION

IT IS FURTHER ORDERED that:

A.     Judgment in the amount of Forty-Eight Million Two Hundred Eighty
Thousand Three Hundred Twenty-Eight Dollars ($48,280,328) is entered in favor

of the Commission against Individual Defendant and Corporate Defendants jointly and severally, as monetary relief.

      **B.**    Defendants are ordered to pay to the Commission $250,000 within 20 days of entry of this Order.  Such payment must be made by electronic fund transfer in accordance with instructions provided by a representative of the Commission.

      **C.**    Upon such payment, the remainder of the judgment is suspended, subject to the Subsections below.

      **D.**    The Commission's agreement to the suspension of part of the judgment is expressly premised upon the truthfulness, accuracy, and completeness of Defendants' sworn financial statements and related documents (collectively, "financial representations") submitted to the Commission, namely:

1. the Financial Statement of Individual Defendant Roy Ferman signed on March 3, 2025, including the attachments;

2. the Financial Statement of Individual Defendant Roy Ferman signed on September 10, 2025, including the attachments;

3. the Financial Statement of Corporate Defendants signed by Defendant Roy Ferman on March 3, 2025, including the attachments;

4. the Financial Statement of Corporate Defendants signed by Defendant Roy Ferman on September 10, 2025, including the attachments;

5. the additional documentation submitted by email from Defendants' counsel Peter Steinman to Commission counsel Maya Sequeira dated March 13, 2025;

6. Defendants' responses to expedited interrogatories dated April 9, 2025;

7. Individual Defendant's responses to second set of expedited interrogatories dated May 16, 2025;

8. Individual Defendant's further supplemental responses to second set of expedited interrogatories dated September 3, 2025;

9. Individual Defendant's update to Financial Statement by the spreadsheet provided to Commission counsel on May 23, 2025;

10. the additional documentation submitted by email from Individual Defendant's counsel Matthew Rapkowski to Commission counsel Maya Sequeira, Katherine Worthman, and Julia Heald dated September 5, 8, 11, and 12, 2025; and

11. the additional documentation submitted by email from Defendants' counsel Collin H. Craig to Commission counsel Maya Sequeira, Katherine Worthman, and Julia Heald dated September 6, 9, and 11, 2025.

E.     The suspension of the judgment will be lifted as to any Defendant if, upon motion by the Commission, the Court finds that Defendant failed to disclose any material Asset, materially misstated the value of any Asset, or made any other material misstatement or omission in the financial representations identified above.

F.     If the suspension of the judgment is lifted, the judgment becomes immediately due as to that Defendant in the amount specified in Subsection A above (which the parties stipulate only for purposes of this Section represents the Consumer injury alleged in the complaint), less any payment previously made pursuant to this Section, plus interest computed from the date of entry of this Order.

## X. ADDITIONAL MONETARY PROVISIONS

IT IS FURTHER ORDERED that:

A.    Defendants relinquish dominion and all legal and equitable right, title, and interest in all Assets transferred pursuant to this Order and may not seek the return of any Assets.

B.    The facts alleged in the Complaint will be taken as true, without further proof, in any subsequent civil litigation by or on behalf of the Commission, including in a proceeding to enforce its rights to any payment or monetary judgment pursuant to this Order, such as a nondischargeability complaint in any bankruptcy case.

C.    The facts alleged in the Complaint establish all elements necessary to sustain an action by the Commission pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), and this Order will have collateral estoppel effect for such purposes.

D.    Each Defendant acknowledges that Defendant's Employer Identification Number, Social Security Number, or other Taxpayer Identification Number ("TIN"), including all TINs that Defendants previously provided, may be used by the Commission for reporting and other lawful purposes, including collecting on any delinquent amount arising out of this Order in accordance with 31 U.S.C. §7701.

E.    All money received by the Commission pursuant to this Order may be deposited into a fund administered by the Commission or its designee to be used for Consumer relief, such as redress and any attendant expenses for the administration of any redress fund.  If a representative of the Commission decides that direct redress to Consumers is wholly or partially impracticable or money remains after such redress is completed, the Commission may apply any remaining money for such related relief (including Consumer information remedies) as it

determines to be reasonably related to Defendants' practices alleged in the

Complaint.  Any money not used for relief is to be deposited to the U.S. Treasury.

Defendants have no right to challenge any actions the Commission or its

representatives may take pursuant to this Subsection.

## XI. CUSTOMER INFORMATION

IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents,

employees, and attorneys, and all other persons in active concert or participation

with any of them, who receive actual notice of this Order by personal service or

otherwise, are permanently restrained and enjoined from directly or indirectly:

A.      failing to provide sufficient customer information to enable the

Commission to efficiently administer Consumer redress. If a representative of the

Commission requests in writing any information related to redress, Defendants

must provide it, in the form prescribed by the Commission, within 14 days.

B.      disclosing, using, or benefitting from customer information, including

the name, address, telephone number, email address, social security number, other

identifying information, or any data that enables access to a customer's account

(including a credit card, bank account, or other financial account), that any

Defendant obtained prior to entry of this Order in connection with the advertising,

marketing, promoting, or offering for sale of financial product or services; and

C.      failing to destroy such customer information in all forms in their

possession, custody, or control within 30 days after receipt of written direction to

do so from a representative of the Commission.

Provided, however, that customer information need not be disposed of, and

may be disclosed, to the extent requested by a government agency or required by

law, regulation, or court order.

## XII. ORDER ACKNOWLEDGMENTS

IT IS FURTHER ORDERED that Defendants obtain acknowledgments of receipt of this Order:

A.    Each Defendant, within 7 days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.    For 10 years after entry of this Order, the Individual Defendant for any business that such Defendant, individually or collectively with any other Defendants, is the majority owner or controls directly or indirectly, and each Corporate Defendant, must deliver a copy of this Order to:  (1) all principals, officers, directors, and LLC managers and members; (2) all employees having managerial responsibilities for conduct related to the subject matter of the Order and all agents and representatives who participate in conduct related to the subject matter of the Order; and (3) any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting.  Delivery must occur within 7 days of entry of this Order for current personnel.  For all others, delivery must occur before they assume their responsibilities.

C.    From each individual or entity to which a Defendant delivered a copy of this Order, that Defendant must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

## XIII. COMPLIANCE REPORTING

IT IS FURTHER ORDERED that Defendants make timely submissions to the Commission:

A.    One year after entry of this Order, each Defendant must submit a compliance report, sworn under penalty of perjury:

1.    Each Defendant must:  (a) identify the primary physical, postal, and email address and telephone number, as designated points of contact,

which representatives of the Commission may use to communicate with Defendant; (b) identify all of that Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses; (c) describe the activities of each business, including the goods and services offered, the means of advertising, marketing, and sales, and the involvement of any other Defendant (which Individual Defendant must describe if they know or should know due to their own involvement); (d) describe in detail whether and how that Defendant is in compliance with each Section of this Order; and (e) provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

2.     Additionally, the Individual Defendant must:  (a) identify all telephone numbers and all physical, postal, email and Internet addresses, including all residences; (b) identify all business activities, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which such Defendant has any ownership interest; and (c) describe in detail such Defendant's involvement in each such business, including title, role, responsibilities, participation, authority, control, and any ownership.

B.     For 20 years after entry of this Order, each Defendant must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following:

1.     Each Defendant must report any change in:  (a) any designated point of contact; or (b) the structure of any Corporate Defendant or any entity that Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order,

1   including:  creation, merger, sale, or dissolution of the entity or any

2   subsidiary, parent, or affiliate that engages in any acts or practices subject to

3   this Order.

4            2.       Additionally, the Individual Defendant must report any change

5   in:  (a) name, including aliases or fictitious name, or residence address; or

6   (b) title or role in any business activity, including any business for which

7   such Defendant performs services whether as an employee or otherwise and

8   any entity in which such Defendant has any ownership interest, and identify

9   the name, physical address, and any Internet address of the business or

10  entity.

11       C.       Each Defendant must submit to the Commission notice of the filing of

12  any bankruptcy petition, insolvency proceeding, or similar proceeding by or

13  against such Defendant within 14 days of its filing.

14       D.       Any submission to the Commission required by this Order to be

15  sworn under penalty of perjury must be true and accurate and comply with 28

16  U.S.C. § 1746, such as by concluding:  "I declare under penalty of perjury under

17  the laws of the United States of America that the foregoing is true and correct.

18  Executed on:  _____" and supplying the date, signatory's full name, title (if

19  applicable), and signature.

20       E.       Unless otherwise directed by a Commission representative in writing,

21  all submissions to the Commission pursuant to this Order must be emailed to

22  DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to:

23  Associate Director for Enforcement, Bureau of Consumer Protection, Federal

24  Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC  20580.  The

25  subject line must begin:  FTC v. Seek Capital, LLC, et al., X250013.

26                              XIV. RECORDKEEPING

27

1    IT IS FURTHER ORDERED that Defendants must create certain records for

2    20 years after entry of the Order, and retain each such record for 5 years.

3    Specifically, Corporate Defendants in connection with the advertising, marketing,

4    promoting, or offering for sale of any goods or services and the Individual

5    Defendant for any business that such Defendant, individually or collectively with

6    any other Defendants, is a majority owner or controls directly or indirectly must

7    create and retain the following records:

8        A.    accounting records showing the revenues from all goods or services

9    sold;

10        B.    personnel records showing, for each person providing services,

11    whether as an employee or otherwise, that person's:  name; addresses; telephone

12    numbers; job title or position; dates of service; and (if applicable) the reason for

13    termination;

14        C.    records of all Consumer complaints and refund requests concerning

15    the subject matter of this Order, whether received directly or indirectly, such as

16    through a third party, and any response;

17        D.    all records necessary to demonstrate full compliance with each

18    provision of this Order, including all submissions to the Commission; and

19        E.    a copy of each unique advertisement or other marketing material.

20    XV. COMPLIANCE MONITORING

21    IT IS FURTHER ORDERED that, for the purpose of monitoring

22    Defendants' compliance with this Order, including the financial representations

23    upon which part of the judgment was suspended, and any failure to transfer any

24    Assets as required by this Order:

25        A.    Within 14 days of receipt of a written request from a representative of

26    the Commission each Defendant must:  submit additional compliance reports or

27

1   other requested information, which must be sworn under penalty of perjury; appear

2   for depositions; and produce documents for inspection and copying.  The

3   Commission is also authorized to obtain discovery, without further leave of court,

4   using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30

5   (including depositions by remote means), 31, 33, 34, 36, 45, and 69.

6        B.    For matters concerning this Order, the Commission is authorized to

7   communicate directly with each Defendant.  Defendant must permit

8   representatives of the Commission to interview any employee or other person

9   affiliated with any Defendant who has agreed to such an interview.  The person

10  interviewed may have counsel present.

11       C.    The Commission may use all other lawful means, including posing,

12  through its representatives as consumers, suppliers, or other individuals or entities,

13  to Defendants or any individual or entity affiliated with Defendants, without the

14  necessity of identification or prior notice.  Nothing in this Order limits the

15  Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of

16  the FTC Act, 15 U.S.C. §§ 49, 57b-1.

17       D.    Upon written request from a representative of the Commission, any

18  consumer reporting agency must furnish consumer reports concerning Individual

19  Defendant, pursuant to Section 604(1) of the Fair Credit Reporting Act, 15 U.S.C.

20  §1681b(a)(1).

21             XVI.  RETENTION OF JURISDICTION

22       IT IS FURTHER ORDERED that this Court retains jurisdiction of this

23  matter for purposes of construction, modification, and enforcement of this Order.

24  SO ORDERED this __30TH__ day of __SEPTEMBER__, 2025.

25

26                                    _Gary Klauser_

27                                    Honorable R. Gary Klauser
                                      United States District Judge

**SO STIPULATED AND AGREED:**

**FOR PLAINTIFF:**

DATED: September 23, 2025          *s/ Maya Sequeira*

MAYA SEQUEIRA (pro hac vice)
msequeira@ftc.gov
(202) 326-3719
KATHERINE WORTHMAN (pro hac vice)
kworthman@ftc.gov
(202) 326-2929
JULIA E. HEALD (pro hac vice)
jheald@ftc.gov
(202) 326-3589
SALLY TIEU, Cal. Bar No. 346034
stieu@ftc.gov
(202) 304-7313
FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Mail stop CC-10232
Washington, D.C. 20580

AARON SCHUE, Cal. Bar No. 338760
aschue@ftc.gov
(310) 824-4306
FEDERAL TRADE COMMISSION
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024

1

**FOR DEFENDANTS:**

2

DATED:

Signed by:

*s/* Collin Craig

5DD8401224C54CF...

COLLIN H. CRAIG (CA Bar No. 339194)

3

ccraig@porterscott.com

(916) 929-1481

4

MARTIN N. JENSEN (CA Bar No. 232231)

5

mjensen@porterscott.com

PORTER SCOTT, A PROFESSIONAL

6

CORPORATION

7

2180 Harvard Street, Suite 500

Sacramento, CA 95815

8

9

*Attorneys for Defendants Seek Capital, LLC,*

*a Delaware limited liability company, Seek*

10

*Capital, LLC, a California Limited Liability*

*Company, and Roy Ferman*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

1    DATED:

       *s/*   *Matthew Rapkowski*
       DocuSigned by:
       DB988E59E27C484...

2    RICHARD W. EPSTEIN (pro hac vice)
        Richard.epstein@gmlaw.com

3      (954) 491-1120
        GREENSPOON MARDER LLP

4      200 East Broward Blvd., Suite 1800
        Fort Lauderdale, FL 33301

5

6      RICHARD GILLER (CA Bar No. 117823)
        Richard.giller@gmlaw.com

7      (323) 880-0859
        GREENSPOON MARDER LLP

8      1875 Century Park East, Suite 1900
        Los Angeles, CA 90067

9

10

11     MATTHEW S. RAPKOWSKI
        Matthew.rapkowski@gmlaw.com

12     (212) 524-4997
        GREENSPOON MARDER LLP

13     1345 Avenue of the Americas, Suite 2200
        New York, NY 10105

14

15     *Attorneys for Defendant Roy Ferman*

16

17

18

19

20

21

22

23

24

25

26

27

1   DATED: 9/20/2025

2                                    _____
                                     ROY FERMAN, Defendant
3

4                                    _____
5                                    SEEK CAPITAL, LLC, a Delaware limited
6                                    liability company, Defendant
7                                    By: Roy Ferman, Chief Executive Officer
8                                    _____
9                                    SEEK CAPITAL, LLC, a California limited
10                                   liability company, Defendant
11                                   By: Roy Ferman, Chief Executive Officer
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

ATTACHMENT A

NO JS6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:24-cv-09511-RGK | Date | September 16, 2025 |
|---|---|---|---|
| Title | *Federal Trade Commission v. Seek Capital, LLC et al.* | | |

| Present: The Honorable | R. GARY KLAUSNER, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Joseph Remigio | Not Reported | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiff: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:** **(IN CHAMBERS) Order Re: The FTC's Motion for Summary Judgment [75]; Defendant Roy Ferman's Motion for Partial Summary Judgment [92]**

## I.   **INTRODUCTION**

On November 4, 2024, the Federal Trade Commission (the "FTC") filed a Complaint against Seek Capital, LLC, a Delaware limited liability company, Seek Capital, LLC, a California limited liability company (both entities collectively, "Seek"), and the entities' CEO, Roy Ferman (collectively, "Defendants"). The FTC asserts claims for violations of Section 5(a) of the FTC Act ("FTCA"), the Telemarketing Sales Rule ("TSR"), and the Consumer Review Fairness Act ("CRFA"). (ECF No. 1.)

On January 17, 2025, the FTC filed a Motion for a Preliminary Injunction, requesting the Court enjoin Defendants from certain prohibited conduct. (ECF No. 30.) On February 20, 2025, the Court granted and ordered the preliminary injunction. (ECF No. 50.)

Presently before the Court are two motions: the FTC's Motion for Summary Judgment (ECF. No. 75) and Ferman's Motion for Partial Summary Judgment (ECF No. 92). For the following reasons, the Court **GRANTS in part** the FTC's Motion and **DENIES** Ferman's Motion.

## II.   **FACTUAL BACKGROUND**

The following facts are uncontroverted[1] unless otherwise stated:

Ferman is the founder, CEO, and board member of Seek, a business funding matching company that has marketed its services to new and aspiring small business owners. (The FTC's Resp. to Statement of Genuine Disputes of Material Fact ("FTC RSF"), ¶ 5, ECF No. 99-1; Compl. ¶ 2; Answer ¶ 14, ECF

---

[1] Defendants make numerous objections to the evidence presented in opposition to the FTC's Motion. To the extent the Court relies upon evidence to which Defendants have objected, the objections are **OVERRULED**. To the extent the Court does not rely upon evidence to which Defendants have objected, the objections are **DENIED** as moot.

NO JS6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:24-cv-09511-RGK | Date | September 16, 2025 |
|----------|-------------------|------|--------------------|
| Title | *Federal Trade Commission v. Seek Capital, LLC et al.* | | |

No. 24; Ferman Decl., ¶¶ 4, 13, ECF No. 91-3 ("Ferman Decl.").) Although Seek technically encompasses two corporate entities, Seek functions and Defendants treat it as one. (FTC RSF ¶¶ 12–13.)

As Seek's founder and CEO, Ferman has participated in and has authority over Seek's business operations, including signing corporate formation documents, corporate bank accounts, and third-party contracts as well as serving as the primary contact for Seek's lead generators, payment processors, and domain registrars and hiring and firing Seek personnel. (*Id.* ¶¶ 5–8, 9, 10, 14–15, 16, 21, 24–31.) Ferman has also been involved in Seek's business with respect to its marketing strategy, lender communications, and reviewing and responding to consumer complaints concerning Seek's business. (*Id.* ¶¶ 27, 28, 32, 34–35, 50–51, 115, 138.)

Defendants have marketed their purported services to consumers through internet advertisements, Seek's website, third-party websites, emails to consumers, and telemarketing. (*See, e.g., id.* ¶¶ 41, 47, 54, 60, 64.) Within these marketing efforts, Defendants have made several types of representations concerning their business, including that (1) they would secure business loans or lines of credit for customers (*id.* ¶¶ 42–43, 45, 49–52 54, 57, 61, 64–66, 68–69); (2) Seek had a relationship with lenders that provided Seek customers benefits unavailable to the public (*id.* ¶¶ 102–107); (3) they would secure credit cards with line of credit capabilities (*id.* ¶¶ 133–134, 136); (4) they would secure specific financing terms, such as zero percent annual percentage rate ("APR") for a specified time (*id.* ¶¶ 143–46); (5) Seek would not charge fees until funding was approved (*id.* ¶¶ 152–53, 155, 158, 159); (6) Seek's services would not harm customers' credits scores (*id.* ¶¶ 57, 168–69, 174); and (7) Seek received overwhelmingly positive customer reviews (*see id.* ¶¶ 182–83).

Seek's business services involved applying exclusively for credit cards with lenders on behalf of its customers. (*Id.* ¶¶ 38, 93.) If consumers were interested in Seek's services, Seek's telemarketers would call and send them a "Funding Estimate Agreement" ("FEA"), which outlined the business terms, including fees. (*Id.* ¶ 78; Ferman Decl. ¶ 28.) Soon after the FEA was signed, Seek would have consumers sign a notarized Limited Powers of Attorney, which gave Seek the authority to submit credit and loan facilities on a consumer's behalf. (FTC RSF ¶ 88.) After those agreements were signed, Seek would conduct a verification call with customers to gather further information about their funding needs. (*Id.* ¶ 89.) During or after this call, Seek would send customers a pre-filled form contract, the "Verification and Compliance Questionnaire" ("VCQ"), for their signature. (*Id.* ¶ 90.) Since at least November 4, 2021, the VCQ has contained a clause prohibiting customers from posting online any negative comments, reviews, or complaints about Seek for three years. (*Id.* ¶ 217.) After the VCQ was signed, Seek would submit the credit card applications to lenders. (*Id.* ¶ 94.)

When applying for credit cards for customers, Seek has secured more credit than the maximum funding amount a customer had explicitly approved. (*Id.* ¶¶ 205, 207.) Additionally, Seek would acquire credit cards with varying financing terms, some with and without a zero percent APR. (*Id.* ¶ 147;

NO JS6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:24-cv-09511-RGK | Date | September 16, 2025 |
|---|---|---|---|
| Title | *Federal Trade Commission v. Seek Capital, LLC et al.* | | |

Ferman Decl. ¶¶ 15–16.) During the credit card application process, "hard" credit inquiries were conducted to check Seek's customers' credit scores. (FTC RSF ¶ 175.)

Defendants have received negative feedback from customers and lenders alike. For example, Defendants have received and prepared responses to consumer complaints concerning Seek's business practices. (*See id.* ¶¶ 34–35, 39.) More specifically, Defendants have received feedback from some customers that they were surprised and "unhappy" to learn their funding would be provided with credit cards. (*Id.* ¶ 96.) Additionally, Defendants have received cease-and-desist letters from banks concerning Defendants' credit card application practices. (*Id.* ¶¶ 113–16.)

Over the course of business operations, Defendants have charged customers several fees, including funding fees (based on a percentage of the credit card limits Seek secured), application fees, same-day funding fees (for optional expediting application services), and bank negotiation fees (for optional bank negotiation services). (*Id.* ¶¶ 198, 201–02, 220, 229, 230.) Additionally, Defendants have charged customers early termination fees when they have canceled services after signing the FEA and before receiving funding. (*Id.* ¶ 160.) In total, these fees have resulted in customers paying Seek $48,280,328.57, after subtracting credits, refunds, or disputes. (*Id.* ¶ 231.)

## III.    JUDICIAL STANDARD

### A.    Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56(a), a court may grant summary judgment only if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To prevail on a summary judgment motion, the movant must show that there are no genuine issues of material fact as to matters on which it has the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Upon such a showing, the Court may grant summary judgment on all or part of the claim. Fed. R. Civ. P. 56(a).

To defeat a summary judgment motion, the non-moving party may not merely rely on its pleadings or on conclusory statements. *See Celotex*, 477 U.S. at 324. Nor may the non-moving party merely attack or discredit the moving party's evidence. *Nat'l Union Fire Ins. Co. v. Argonaut Ins. Co.*, 701 F.2d 95, 96–97 (9th Cir. 1983). The non-moving party must affirmatively present specific evidence sufficient to create a genuine issue of material fact for trial. *See Celotex*, 477 U.S. at 324. The materiality of a fact is determined by whether it might influence the outcome of the case based on the contours of the underlying substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over such facts amount to genuine issues if a reasonable jury could resolve them in favor of the nonmoving party. *Id.*

NO JS6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:24-cv-09511-RGK | Date | September 16, 2025 |
|---|---|---|---|
| Title | *Federal Trade Commission v. Seek Capital, LLC et al.* | | |

The Court first addresses the FTC's Motion for Summary Judgment before considering Ferman's Motion for Partial Summary Judgment

## IV.    THE FTC'S MOTION FOR SUMMARY JUDGMENT

### A.    Discussion

The FTC moves for summary judgment, seeking judgment that: (1) Defendants' misrepresentations violated the FTCA and TSR; (2) Defendants' unauthorized and deceptive billing practices violated the FTCA; (3) Defendants' form contract violated the CRFA; (4) Defendants are liable as a common enterprise; (5) Defendants' affirmative defenses fail; and (6) Defendants are liable for injunctive and monetary relief. The Court addresses each argument in turn.

#### 1.    *Misrepresentations*

Section 5 of the FTCA prohibits "unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). Similarly, the FTC enacted the TSR because of a directive from Congress to "prescribe rules prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices." 15 U.S.C. § 6102(a)(1). Any violation of the TSR constitutes an unfair and deceptive act or practice in violation of Section 5 of the FTC Act. 15 U.S.C. § 57a(d)(3), § 6102(b), (c).

Under the FTCA, a representation is considered deceptive if it is (1) likely to mislead consumers acting reasonably under the circumstances, and (2) material. *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994). In assessing whether a representation or practice is likely to mislead consumers, a court may consider the overall "net impression" conveyed by the representation. *FTC v. Cyberspace.Com, LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006) ("A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures."). Evidence of past deception is "highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances." *Id.* at 1201.

Similarly, the TSR prohibits telemarketing practices that include misrepresentations as to material information, like "[a]ny material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer . . . ." 16 C.F.R. § 310.3(a)(2)(iii)

Here, the FTC asserts Defendants misrepresent that: (1) they procure loans or lines of credit for customers when they actually obtain credit cards; (2) they have relationships with lenders; (3) they offer credit cards with "line of credit capability"; (4) they offer specific favorable financing terms, like zero percent APR; (5) they charge no fees until their customer receives funding; (6) using their services will not harm their customers' credit scores; and (7) their business reviews are positive. Defendants do not

NO JS6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:24-cv-09511-RGK | Date | September 16, 2025 |
|----------|-------------------|------|--------------------|
| Title | *Federal Trade Commission v. Seek Capital, LLC et al.* | | |

dispute making these representations. Nor do they dispute that these statements are material. Indeed, express claims about the nature of a defendant's services are presumed material. *See Pantron I Corp.*, 33 F.3d at 1095–96. Instead, they dispute only whether the representations were false and misleading. The Court analyzes each representation in turn.

   a.    *Business Loans and Lines of Credit*

   The FTC asserts that Defendants represent through advertisements, Defendants' website, representations on third-party websites, emails to consumers, and telemarketing calls that they procure loans or lines of credit when, in practice, they only secure credit cards. Defendants concede such representations were made, including claims like "Need a Business Startup Loan?" and confirming consumers can obtain funding through "the line of credit route." (*See, e.g.*, FTC RSF ¶ 43, 65.)

   The FTC argues that these representations are false and misleading given that Defendants solely apply for credit cards for customers, not loans or lines of credit, and many of these representations do not specifically reference credit cards. Defendants do not dispute that they only procure credit cards for customers. Instead, Defendants argue that these representations are truthful because credit cards are technically lines of credit and are classified as revolving loans. Looking to the net impressions of these representations, the Court finds that there is a genuine dispute of material fact as to whether these representations concerning loans and lines of credit are misleading.

   The FTC has pointed to persuasive evidence that indicates that these representations could be misleading. For instance, when Defendants have explicitly referenced credit cards in their business offerings, the references were alongside offers for loans and lines of credit, which may mislead consumers to believe that the loans or lines of credit were in addition to, rather than were themselves, the credit cards. (*See, e.g.*, Limited Power of Attorney, Ex. E at ¶ 1, ECF No. 91-8 ("pursuit and acquisition of credit and loan facilities (credit and loan facilities will consist of one or more of the following: business and personal credit cards, bank lines of credit and bank loans) . . . .") Additionally, Ferman agreed with a third party that Defendants representing that they could secure "loans" in advertising copy was "misleading." (FTC RSF ¶ 97.) In fact, Seek's clients have confirmed they were surprised and "unhappy" that the funding Seek had advertised about would be provided through credit cards. (*Id.* ¶ 96.) *See F.T.C. v. Cyberspace.Com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) (noting that evidence that representations deceived consumers "is highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances").

   However, as Defendants argued in their Opposition, courts in the Ninth Circuit have considered credit cards to be lines of credit and are classified as revolving loan account arrangements. *See Ward v. Costco Wholesale Corp.*, 2009 WL 10670191, at *1 (C.D. Cal. May 6, 2009) (noting the outstanding balance on a credit card is a line of credit); *F.T.C. v. Am. Standard Credit Sys., Inc.*, 874 F. Supp. 1080, 1085 (C.D. Cal. 1994) (referencing "credit card" synonymously with a "line of credit"); *Hernandez v.*

NO JS6

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:24-cv-09511-RGK | Date | September 16, 2025 |
|---|---|---|---|
| Title | *Federal Trade Commission v. Seek Capital, LLC et al.* | | |

*Experian Info. Sols., Inc.*, 2021 WL 2325019, at *3 (C.D. Cal. June 4, 2021), *rev'd and remanded*, 2022 WL 1315306 (9th Cir. May 3, 2022) ("for revolving loans like credit cards"); *Du-Phillips v. Citibank, N.A.*, No. CV 25-00034 JAO-RT, 2025 WL 1615329, at *6 (D. Haw. June 5, 2025) (noting that a credit card is a "revolving loan account arrangement"); *but see Wisdom v. Wells Fargo Bank NA*, 2012 WL 170900, at *1 (D. Ariz. Jan. 20, 2012) (differentiating between a plaintiff's personal credit card and a line of credit on his home). This precedential understanding that credit cards are a type of line of credit and are classified as revolving loans introduces a dispute of fact that could be reasonably resolved in the Defendants' favor. Thus, the Court finds that a genuine dispute of material fact exists as to whether Defendants' representations concerning loans and lines of credit are misleading.

### b.    *Relationships with Lenders*

The FTC contends that Defendants misrepresent Seek's relationships with lenders. It is undisputed that Defendants have claimed in sales pitches to consumers that Seek has "special" and "direct relationships" with lenders and banks, that they "do not accept a single penny" from their lending partners, and that Seek can provide consumers with access to publicly unavailable programs. (FTC RSF ¶¶ 102–05, 108.) The parties dispute the veracity of these representations.

The FTC argues that these representations are false and misleading, noting that, in actuality, banks have sent Seek cease-and-desist letters, admonishing its business practices, and have automatically declined credit card applications connected with Defendants. (*Id.* ¶¶ 113–16, 126.) Additionally, Defendants have admitted that they do not have relationships with lenders that benefit consumers, and that their only agreements with banks are to compensate Seek in exchange for matching and referring customers. (*Id.* ¶ 109.)

In their Opposition, Defendants offer no argument to contest the FTC's assertions but rather dispute ancillary facts to this issue. However, the record is clear that Defendants in fact did not have relationships with lenders that would provide consumers any sort of unique benefit as they had represented. Additionally, Defendants accepted compensation from lenders, which directly conflicts with their marketing representations. The Court agrees with the FTC that these false claims were likely to deceive consumers looking to benefit from Seek's purported relationships with lenders. Thus, these representations are misleading and violate the FTCA and TSR.

### c.    *Line of Credit Capability*

Next, the FTC asserts that when Defendants told consumers their services involve procuring credit cards, they misrepresented that the cards have "line of credit capabilities," which Defendants do not dispute. (*Id.* ¶¶ 129, 131–32.) The FTC further asserts that in actual practice, Defendants do not obtain credit cards with line of credit capabilities, like providing access to cash, which again Defendants

NO JS6

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:24-cv-09511-RGK | Date | September 16, 2025 |
|----------|-------------------|------|--------------------|
| Title | *Federal Trade Commission v. Seek Capital, LLC et al.* | | |

do not dispute. (*See, e.g., id.* ¶ 142 (citing Munoz Decl., Attach. D ¶ 11, ECF No 8-3 ("Neither credit card provided [my] business with a revolving line of credit allowing access to cash as promised.")).)

Defendants do dispute that this representation is misleading. Defendants argue that advertising their credit cards "with line of credit capability" is not a misrepresentation but rather a descriptive add on to describe a method in which the credit card could be used. Defendants claim that when paired with Seek's services, their offered credit cards have adopted characteristics of other types of lines of credit.

However, as this Court has noted previously, the fact that *some* credit cards have that feature does not make Defendants' indiscriminate use of the term "credit cards with line of credit capability" nondeceptive. (ECF No. 50.) The undisputed record shows that consumers have been unable to use the Seek-procured credit cards as another type of line of credit, like liquidating them for cash access, beyond the features of a standard credit card. (FTC RSF ¶ 141.) It is clear to the Court that representations that a credit card has line of credit capabilities would mislead a reasonable consumer to believe that the credit card would have additional capabilities than those traditional to that funding source. Thus, there is no genuine dispute that these misrepresentations are misleading.

> d.    *Financing Terms*

The FTC asserts that Defendants have represented that Seek offers consumers a zero percent APR financing term, claiming there will be "no interest repayments for the first 12 months" and "0% interest for first 12-18 months." (*Id.* ¶¶ 143–45.) Despite these representations to consumers, Defendants have secured credit cards without such financing terms. For example, for one consumer, Defendants secured at least ten credit cards, many of which did not have a twelve-month zero percent APR. (*Id.* ¶ 148.)

Defendants have admitted that they have secured credit cards without a zero percent APR. (*Id.* ¶ 147.) However, they argue that the financing terms were truthful and not misleading because for the credit cards secured at a non-zero percent rate, Defendants intended to merge those cards with zero percent APR credit cards. Defendants assert that clients were informed of this funding strategy and were told not to use the non-zero percent APR credit cards, and thus the net impression of the representations regarding the financing terms was truthful. The Court disagrees.

Subsequent disclosures do not necessarily cure an initial deception. *FTC v. Resort Car Rental Sys.*, 518 F.2d 962, 964 (9th Cir. 1975). The FTCA "is violated if [the defendant] induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract." *Id.* Thus, even if Defendants did clarify with customers after Seek applied for credit cards on their behalf that some were non-zero percent APR credit cards, this subsequent disclosure does not cure the initial misleading representation. Defendants fail to address that falsely advertising specific financing terms is misleading to a reasonable consumer. Considering the net impressions of such representations along

NO JS6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:24-cv-09511-RGK | Date | September 16, 2025 |
|---|---|---|---|
| Title | *Federal Trade Commission v. Seek Capital, LLC et al.* | | |

with the subsequent disclosures, the Court finds that there is no genuine dispute that these representations were false and misleading, in violation of the FTCA and TSR.

  e.  *No Fees Until Funding*

  Next, the FTC contends that Defendants have claimed to consumers that Seek does not charge "upfront fees," its fees are results-based, and no costs are incurred until funding is approved. (FTC RSF ¶¶ 152–53, 155.) The FTC argues that these claims are false, offering evidence that Defendants would actually charge consumers early termination fees before they were approved for the promised funding if consumers cancelled the transaction after the FEA was signed.

  Defendants do not dispute that they made such representations or that Seek has charged customers an early termination fee, which is non-contingent on funding approval or any other result. Defendants argue that the early termination fee has been disclosed multiple times to customers in writing and over the phone, including within the FEA in red font (which stands out against the all-black type page). Defendants also argue that clients have the right to rescind the early termination fee during a verification call with Seek personnel, and thus these representations are not misleading. The Court is not convinced.

  The undisputed fact remains that Defendants represented to consumers that Seek did not charge any upfront fees and that its fees were results driven, but then did charge consumers a fee without customers receiving funding approval or any other result. Moreover, the FTC has presented undisputed evidence that Defendants' customers have been rushed to sign the FEA and were told they did not need to read it. (*Id.* ¶¶ 84, 86.) As a result, the misrepresentation is not cured by the FEA disclosure. *See FTC v. Am. Fin. Benefits Ctr.*, 2018 WL 11354861, at *9–10 (N.D. Cal. Nov. 29, 2018) (misrepresentations not cured by disclosures in contracts consumers were rushed to e-sign at the end of sales calls); *see also FTC v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999) (disclaimer in contract that "consumers eventually sign" is insufficient where it "is not included in the representations"). Accordingly, the Court finds that there is no genuine dispute of material fact that the misrepresentations about charging no fees until funding violated the FTCA and TSR.

  f.  *Credit Score Impact*

  The FTC posits that Defendants falsely represented to consumers that their applications only involve "soft pull" credit inquiries and will not harm customers' credit scores, but, in fact, they knew that the applications involved "hard" credit inquiries. (RSF ¶ 175.) Defendants do not dispute this evidence, and they admit that "hard inquiries" can lower consumers' credit scores. (*See* Def.'s Opp. at 10–11, ECF No. 91.)

Case 2:24-cv-09511-RGK-MAA    Document 137    Filed 09/16/25    Page 9 of 19    Page ID #:11228

NO JS6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:24-cv-09511-RGK | Date | September 16, 2025 |
|---|---|---|---|
| Title | *Federal Trade Commission v. Seek Capital, LLC et al.* | | |

Instead, Defendants argue that these representations concern only the initial preapproval application, at which point Seek performs "soft credit pulls" that do not impact credit scores. Defendants argue that after a consumer was deemed qualified based on these "soft" credit checks, Seek would explain to the consumer that the lender would perform a "hard" credit inquiry in the next step of the application.

However, Defendants fail to reconcile that a reasonable consumer would not know that Defendants' sales representations referred only to one part of the application process. Indeed, the representations appear to concern the entire application process, not one part. For example, Ferman drafted language for Seek's webpage stating that Seek obtains funding for customers with "no hard credit pulls!" (FTC RSF ¶ 168.) Thus, the Court finds there is no genuine dispute of material fact that such representations are likely to mislead a reasonable consumer to believe there would be no "hard" credit inquiries involved with Defendants' services.

g.    *Customer Reviews*

Finally, the FTC asserts that Defendants have made representations that they receive overwhelmingly positive customer reviews, including "4.9/5 Stars," and "98% recommend." (FTC RSF ¶ 182.) The FTC purports that the reviews do not actually reflect consumer experience because consumers (1) are barred from posting negative reviews for three years by the Defendants' VCQ; and (2) have been pressured by telemarketers into leaving positive reviews to continue through the approval process.

Defendants do not dispute that they made such representations, nor do they dispute that the VCQ contains such a clause barring negative feedback. Although Defendants dispute whether telemarketers were trained to pressure consumers to leave positive reviews, they do not dispute whether telemarketers did so in practice. Instead, Defendants argue that these representations are true because Seek *does* have overwhelmingly positive reviews, citing to Ferman's declaration discussing how the reviews appeared authentic for support.[2] Given these potentially authentic positive reviews, Defendants argue there is a genuine dispute of material fact that their representations were accurate. The Court agrees.

The record does not demonstrate that most of the reviews are fake to the extent necessary to render Defendants' representations undisputably false or misleading. Although there is no dispute that Seek consumers are contractually barred from posting negative reviews for three years, the FTC failed to

---

[2] The FTC argues that Ferman's declaration is self-serving and thus should be disregarded. Although in parts of the declaration that may be true, here, Ferman's statements about his analysis of the customer reviews are supported by some facts. Thus, the Court finds them sufficient to create a genuine issue of material fact. *See FTC v. Publ'g Clearing House, Inc.,* 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.").

NO JS6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | 2:24-cv-09511-RGK | Date | September 16, 2025 |
|---|---|---|---|
| Title | *Federal Trade Commission v. Seek Capital, LLC et al.* | | |

establish that there is no genuine dispute that negative reviews would have existed to render Defendants' claims misleading.

In sum, the Court **GRANTS** the FTC's Motion for Summary Judgment of violations of the FTCA and TSR as to misrepresentations about relationships with lenders, line of credit capabilities, financing terms, no fees until funding, and credit score impact. The Court **DENIES** the FTC's Motion for Summary Judgment of FTCA and TSR violations as to all other grounds for misrepresentation.

> 2.    *Deceptive Billing Practices*

The FTC also asserts that Defendants' billing practices violated the FTCA. A practice is unfair under the FTCA where it "causes or is likely to cause substantial injury to consumers [that] is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n). Additionally, as the Court outlined above, a practice is deceptive "(1) if it is likely to mislead consumers acting reasonably under the circumstances (2) in a way that is material." *Cyberspace.Com, LLC,* 453 F.3d at 1199.

It is well settled that billing customers for unauthorized charges causes substantial injury. *See FTC v. Amazon.com, Inc.,* 2016 WL 10654030, at *8 (W.D. Wash. July 22, 2016) (collecting cases). Consumers cannot avoid injury if they do not have a reason to anticipate impending harm and the means to avoid it. *See also FTC v. Neovi, Inc.,* 604 F.3d 1150, 1158 (9th Cir. 2010).

Here, the FTC asserts that Defendants have had three deceptive billing practices: (1) inflating fees; (2) charging early termination fees; and (3) charging fees without providing the related service. First, the FTC has presented evidence that Defendants inflate their fees by securing more credit than their customers want. For example, a consumer requested Defendants secure $40,000 in funding so that he could purchase a trailer for his trucking company. (FTC RSF ¶ 208.) Defendants told him that they could secure $50,000 to $60,000 and ultimately sent him an invoice indicating that they had secured more than $60,000 in credit. (*Id.*) Defendant have admitted that they have a practice of obtaining about "115% of Funding Proposal offered to client and in contract" when securing "actual funding." (*Id.* ¶ 207.) The FTC argues that since Defendants charge fees based on the percentage of the credit secured, Defendants have unfairly inflated their fees without customer authorization by securing higher limits. Defendants do not contest that they have inflated their fees in such a manner. Instead, they justify this billing practice by arguing that they received customer approval via the signed FEA, which permits Defendants to secure up to twenty percent above the maximum approved funding. (Ferman Decl. ¶¶ 31, 39; FEA, Ex. D, ECF No. 91-7.)

The Court finds the record to be unclear about whether this disclosure in the FEA is sufficient to inform consumers that they agree to potentially twenty percent more funding, and thus a larger service fee to Seek, when signing the contract. Additionally, there is a genuine dispute as to whether a higher

NO JS6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:24-cv-09511-RGK | | Date | September 16, 2025 |
|---|---|---|---|---|
| Title | *Federal Trade Commission v. Seek Capital, LLC et al.* | | | |

credit limit, which is what the inflated fee is based on, benefits consumers by providing them access to additional funding, thus potentially outweighing the costs of the related fees. Thus, the FTC fails to establish that there is no genuine dispute as to whether this billing practice is unfair or deceptive.

Second, the FTC claims that Defendants' early termination fees are an unfair billing practice. In their Opposition, Defendants proffer a similar argument as they did for the fee inflation billing practice, noting how the fee was disclosed verbally and in writing, including in the FEA. (Ferman Decl. ¶¶ 31, 37; FEA, Ex. D.) Whereas the record is unclear as to the inflated fees, there does not seem to be a genuine dispute that the early termination fee is a deceptive billing practice in light of Defendants' marketing representations concerning their fees. *See supra* Section IV.A.1.e. As the Court explained above, Defendants' representations that they charge no fees until funding is approved has been likely misleading to consumers given that Defendants have charged customers the early termination fee prior to funding approval. Defendants argue that this practice was not deceptive because, along with other arguments already addressed above, customers could request to rescind this early termination fee. However, spending the time to make such a request is another type of harm caused by this billing practice. *See F.T.C. v. Neovi, Inc.*, 598 F. Supp. 2d 1104, 1115 (S.D. Cal. 2008) (noting that "harm need not be monetary to qualify as injury" and finding that time consumers spent contesting unauthorized checks and "attempting to get their money back" contributed to substantial injury). Thus, there appears to be no genuine dispute of material fact that the early termination fee is a deceptive billing practice.

Finally, the FTC asserts that Defendants have charged consumers fees without providing the related services. As one example, the FTC posits that Defendants charged consumers same-day funding fees to expedite their applications, but then processed the applications in the order they were received. (FTC RSF ¶ 201.) Defendants dispute this fact, declaring that if a client paid for the same day funding fee, Seek would expedite the application and would not place it in the regular queue. Given the conflicting deposition testimonies concerning this issue, there appears to be a genuine dispute about whether Defendants provided the same-day service. *See Anderson*, 477 U.S. at 249–50 (noting that the weight of evidence is not for the court to decide on motion for summary judgment).

As another example, the FTC claims that Defendants have charged customers a fee for bank negotiation services while requiring customers to still do the work. Defendants do not dispute that Defendants hid their involvement from numerous banks and instructed customers who requested bank negotiation services to speak with the bank themselves and not mention Seek. (FTC RSF ¶ 204.) Thus, it appears that there is no genuine dispute that consumers were charged a fee without receiving the benefit of the requested service, and the cost-benefit prong of the unfairness test is easily satisfied. *See FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1201 (C.D. Cal. 2000).

Accordingly, the Court **GRANTS** the FTC's Motion for Summary Judgment of FTCA violations as to Defendants' unfair and deceptive billing practices related to its early termination fees and charging

Case 2:24-cv-09511-RGK-MAA   Document 137   Filed 09/16/25   Page 12 of 19   Page ID #:11231

NO JS6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:24-cv-09511-RGK | Date | September 16, 2025 |
|---|---|---|---|
| Title | *Federal Trade Commission v. Seek Capital, LLC et al.* | | |

for certain services not provided. The Court **DENIES** the FTC's Motion for Summary Judgment of FTCA violations as to all other alleged unfair and deceptive billing practices.

     3.    *Form Contract*

The CRFA prohibits offering a form contract that prohibits or restricts the ability of consumers to leave reviews. 15 U.S.C. § 45b (b), (c). Here, the FTC has provided evidence that Defendants' form contract, the VCQ, contains a provision barring consumers from posting negative online reviews about Defendants for three years. (FTC RSF ¶ 188.) Defendants do not dispute any material fact concerning this violation.

Accordingly, the Court finds there is no genuine dispute of material fact that Defendants violated the CRFA and the Court **GRANTS** the FTC's Motion.

     4.    *Common Enterprise Liability*

The FTC moves to establish that Seek has acted as a common enterprise. "Where one or more corporate entities operate in common enterprise, each may be held liable for the deceptive acts and practices of the others." *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1082 (C.D. Cal. 2012). When determining common enterprise liability, courts look to four factors: "(1) common control; (2) sharing office space and offices; (3) whether business is transacted through a 'maze of interrelated companies'; and (4) commingling of funds." *Id.*

Here, the FTC asserts that both corporate entities were controlled by Ferman, shared the same location, and functioned as one entity. (FTC RSF ¶¶ 5, 12–13.) Defendants do not dispute these facts nor that common enterprise liability exists. Thus, the Court finds that no fact issues exists as to whether Seek acted as a common enterprise, and **GRANTS** the FTC's Motion.

     5.    *Affirmative Defenses*

The FTC moves for summary judgment on all twenty of Defendants' affirmative defenses, arguing that they are either (1) improper negative defenses, (2) entirely unsupported, or (3) irrelevant. Defendants do not oppose. The Court considers the affirmative defenses in the groupings the FTC challenges them in.

       a.    *Improper Negative Defenses*

The FTC asserts that Defendants' first (failure to state a claim), second (deficient pleading), third (no irreparable injury), fourth (no fraudulent or deceptive business practice), sixth (no misrepresentations), seventh (advertising not false and deceptive), thirteenth (no reason to believe), nineteenth (no reliance), and twentieth (no individual liability) defenses are improper negative defenses,

NO JS6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:24-cv-09511-RGK | Date | September 16, 2025 |
|---|---|---|---|
| Title | *Federal Trade Commission v. Seek Capital, LLC et al.* | | |

restating denials of liability or elements of claims, and should therefore be rejected as a matter of law. The Court agrees.

Affirmative defenses absolve defendants of liability, even in cases where "plaintiffs have stated a prima facie case for recovery." *Quintana v. Baca*, 233 F.R.D. 562, 564 (C.D.Cal.2005). "An attack on a plaintiff's case-in-chief is not an affirmative defense." *Vogel v. Huntington Oaks Delaware Partners, LLC*, 291 F.R.D. 438, 442 (C.D. Cal. 2013) (citing *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir.2002)). Defenses concerning a plaintiff's "failure to state a claim is not an affirmative defense; it is a defect in a plaintiff's claim." *Vogel*, 291 F.R.D. at 442.

Indeed, Defendants' first, second, third, fourth, sixth, seventh, thirteenth, nineteenth, and twentieth defenses all argue how the FTC failed to allege facts sufficient to establish its claims and/or the requested relief. However, asserting defects in the FTC's prima facie case are not affirmative defenses. *See Barnes v. AT & T Pension Ben. Plan-Nonbargained Program*, 718 F. Supp. 2d 1167, 1174 (N.D. Cal. 2010). Moreover, asserting factual disagreements with the merits of the FTC's case, like how the sixth affirmative defense argues that there were no misrepresentations, are not the proper subjects of affirmative defenses. *See Fed. Trade Comm'n v. N. Am. Mktg. & Assocs., LLC*, 2012 WL 5034967, at *2 (D. Ariz. Oct. 18, 2012) (holding a defendant's "affirmative defense is a factual disagreement with the merits of Plaintiff's case and not the proper subject of an affirmative defense"). Thus, these affirmative defenses fail as a matter of law.

> b.    *Entirely Unsupported*

Next, the FTC asserts that Defendants admitted there are no facts supporting the following seven affirmative defenses: Defendants' eighth (laches), ninth (statute of limitations), tenth (mootness/res judicata/collateral estoppel), eleventh (waiver/estoppel/consent), twelfth (due process, excessive fines, and commerce clause; first amendment), fifteenth (third parties), and eighteenth (unclean hands) defenses. The FTC argues that this is reason alone to reject the affirmative defenses.

The Court agrees that there is no genuine dispute of material fact that Defendants admitted that there are no facts supporting the eighth, tenth, eleventh, twelfth, fifteenth, and eighteenth defenses, and thus they fail to give sufficient notice concerning the bases for these defenses. *See Desert European Motorcars, LTD v. Desert European Motorcars, Inc.*, 2011 WL 3809933, at *2–4 (C.D.Cal. Aug.25, 2011) (granting a motion to strike affirmative defenses of estoppel, waiver, and laches for failure to state any facts that provide fair notice); *see also N. Am. Mktg. & Assocs., LLC*, 2012 WL 5034967 at *3–5 (striking affirmative defenses of estoppel, waiver, laches, unclean hands, statute of limitations, and damages were caused by third parties because defendants failed to reference supporting facts and thus there was no notice concerning the bases of the defenses).

NO JS6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | 2:24-cv-09511-RGK | Date | September 16, 2025 |
|---|---|---|---|
| Title | *Federal Trade Commission v. Seek Capital, LLC et al.* | | |

As for the ninth affirmative defense concerning statute of limitations, Defendants admit that they have no facts to support this affirmative defense as to the FTC's claims limited to November 4, 2021 through present, but that there is a dispute regarding claims based on acts earlier than that time period. Defendants argue that 15 U.S.C. § 57b(d) bars the FTC from bringing actions more than three years after the rule was violated. However, Section 13(b) of the FTCA, which provides the FTC the authority to bring a suit to enjoin any person or entity violating any law enforced by the FTC, does not specify any limitations period. *See* 15 U.S.C. § 53(b). Thus, Defendants have failed to identify any applicable limitations period to support this affirmative defense. *See F.T.C. v. Ivy Cap., Inc.*, 2011 WL 2470584, at *2 (D. Nev. June 20, 2011) ("A defendant may not assert a statute of limitations defense against the United States government unless the statute in question contains an express limitations period."). Accordingly, there is no genuine dispute of material fact that these affirmative defenses fail.

c.    *Entirely Unsupported*

Finally, the FTC contends that the four remaining affirmative defenses are irrelevant and thus fail. For their fifth affirmative defense, Defendants argue that the FTC is barred from recovering any relief because Defendants had a reasonable basis for their actions and they acted in good faith. The FTC argues this defense fails because good faith is not a defense to the relief sought. While the FTC is correct that "good faith is not a defense to liability under the FTC Act," this defense may be relevant in determining the scope of injunctive relief "because permanent injunctions are only appropriate if 'there exists some cognizable danger of recurrent violation.'" *FTC v. LoanPointe, LLC*, 2011 WL 4348304, at *9 (D. Utah Sept. 16, 2011) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)); *see also Fed. Trade Comm'n v. Vemma Nutrition Co.*, 2016 WL 3548762, at *2 (D. Ariz. June 30, 2016) ("Because the FTC seeks a permanent injunction in this case, good faith is to that extent a valid affirmative defense."). Because the FTC seeks a permanent injunction in this case, good faith is a valid affirmative defense as to the scope of injunctive relief.

For the remaining affirmative defenses, the FTC asserts that the fourteenth (failure to mitigate), sixteenth (voluntary exposure/appreciation of risk), and seventeenth (comparative negligence) are not appropriate because the defenses reference consumers impacted by the conduct at issue and the FTC brings this suit in its own name. The Court agrees that these are not valid affirmative defenses given that "relief under the FTC Act is equitable and dependent on the amount of gain by Defendants, not loss by consumers." *Fed. Trade Comm'n v. Vemma Nutrition Co.*, 2016 WL 3548762, at *2 (D. Ariz. June 30, 2016).

In sum, the Court **GRANTS** the FTC's Motion for Summary Judgment of all affirmative defenses except for the fifth affirmative defense as it relates to damages. The Court **DENIES** the FTC's Motion as to the fifth affirmative defense relating to damages.

6.    *Injunctive and Monetary Relief*

Case 2:24-cv-09511-RGK-MAA    Document 137    Filed 09/16/25    Page 15 of 19    Page ID #:11234

NO JS6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:24-cv-09511-RGK | Date | September 16, 2025 |
|---|---|---|---|
| Title | *Federal Trade Commission v. Seek Capital, LLC et al.* | | |

The FTC moves for summary judgment on two aspects of its requested relief. First, the FTC asserts that Ferman is individually liable for injunctive and monetary relief. Second, the FTC contends that the requested scope of relief is accurate and should be ordered. The Court considers each argument in turn.

a.   *Ferman's Individual Liability*

Individual liability for injunctive relief exists where "(1) the corporation committed misrepresentations of a kind usually relied on by a reasonably prudent person and resulted in consumer injury, and (2) individuals participated directly in the violations or had authority to control the entities." *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1101 (9th Cir. 2014) (citing *Publ'g Clearing House, Inc.*, 104 F.3d at 1170–71).

For monetary relief, individual liability exists where the individual "had knowledge that the corporation or one of its agents engaged in dishonest or fraudulent conduct, that the misrepresentations were the type upon which a reasonable and prudent person would rely, and that consumer injury resulted." *Id.* at 1101 (quoting *Publ'g Clearing House, Inc.*, 104 F.3d at 1171). To satisfy the knowledge requirement, the FTC must establish that defendants "had actual knowledge of material misrepresentations, [were] recklessly indifferent to the truth or falsity of a misrepresentation, or had an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Id.* at 1101-02 (citing *FTC v. Am. Standard Credit Sys., Inc.*, 874 F.Supp. 1080, 1089 (C.D.Cal.1994)). The FTC does not need to show that a defendant intended to defraud consumers, but rather that "the individual's involvement in a fraudulent scheme alone is sufficient to establish the requisite knowledge for personal restitutionary liability." *Id.* at 1102 (quoting *FTC v. Affordable Media*, 179 F.3d 1228, 1235 (9th Cir.1999)).

Here, the FTC asserts that Ferman is personally liable for both injunctive and monetary relief. The Court agrees. First, for injunctive relief liability, the record is clear that Seek made misleading misrepresentations that resulted in consumer injury. *See supra* Section IV.A.1. Additionally, the FTC contends Ferman participated directly in the violations and had authority to control the entities. As the Court mentioned above, the undisputed record shows that Ferman made some of the misrepresentations that violated the FTCA. (*See, e.g.*, FTC RSF ¶ 168.) Additionally, as founder and CEO, Ferman has controlled Seek's business, evident in that he was the signatory for significant business documents, including the corporate formation documents, bank accounts, and third-party contracts. Ferman also served as the primary contact for Seek's lead generator and payment processors, which relate to some of the business practices at issue. Defendants do not dispute these facts.

Second, for monetary relief, the FTC asserts that Ferman had the requisite knowledge of wrongdoing, citing to Ferman arranging the operation, organizing the entities, and directing activities. Indeed, it is undisputed that as owner and CEO of Seek, Ferman personally approved and drafted some

NO JS6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:24-cv-09511-RGK | Date | September 16, 2025 |
|---|---|---|---|
| Title | *Federal Trade Commission v. Seek Capital, LLC et al.* | | |

of Seek's representations, including within telemarketing scripts. (*See, e.g.,* FTC RSF ¶¶ 32, 51, 168.) Moreover, Ferman was aware that Seek's representations concerning "loans" could potentially be "misleading," and he had received and responded to consumer complaints regarding Seek's business practices. (*Id.* ¶¶ 34, 35, 97.) Additionally, in 2022, the First National Bank of Omaha personally addressed Ferman in its letter requesting Seek cease-and-desist its "credit card stacking scheme." (*Id.* ¶ 114.) Again, Defendants do not dispute these facts, which all illustrate Ferman's knowledge, or at least reckless indifference to the truth, of the material misrepresentations Seek has made.

In their opposition, Defendants make the blanket claim that there is a genuine dispute of material fact as to whether Ferman should be individually liable, but they fail to cite any support facts or case law. Regardless, there is no genuine dispute in the record that Ferman had the requisite involvement, control, and knowledge to be individually liable for injunctive and monetary relief for Seek's violations at issue. Thus, the Court concludes that it is proper to hold Ferman individually liable for Seek's wrongdoings, and **GRANTS** the FTC's Motion.

a.   *Scope of Injunctive and Monetary Relief*

Pursuant to Section 19(b) of the FTCA, the Court can grant monetary relief for violations of the rules, including the TSR. *See* 15 U.S.C. § 57b(b); *United States v. MyLife.com, Inc.*, 567 F. Supp. 3d 1152, 1170 (C.D. Cal. 2021). Additionally, Section 13(b) authorizes the Court to grant a permanent injunction against violations of any provisions of law enforced by the FTC. *See* 15 U.S.C. § 53(b).

The FTC asserts that the Court should order injunctive and monetary relief and that the scope of its requested relief is proper because of the seriousness of the present violations and Defendants' history of prior violations. In its opposition, Defendants argue that the FTC's proposed judgment exceeds the seriousness of the violations at issue and that there is a genuine dispute of material fact as to the total monetary amount Seek received from its business operations.

As addressed above, the Court finds that genuine issues of material fact exist as to the Defendants' full liability for the claims at issue. While the Court grants the FTC's Motion for Summary Judgment of some claims, others remain disputed and cannot be decided at this stage of the proceedings. Since there are open questions of liability in this action, the Court finds that genuine disputes of fact remain as to the scope of relief Defendants are liable for. *See Lambert Corp. v. LBJC Inc.*, 2014 WL 2737913, at *5 (C.D. Cal. June 16, 2014) (declining to address what remedies are available to plaintiff because genuine issues of material fact existed as to claim liability); *DuffBrown v. City and County of San Francisco*, 2013 WL 163530, at *7 (N.D.Cal. Jan.15, 2013) ("Because the Court has denied summary judgment as to liability, it need not rule on damages at this time."); *IJL Midwest Milwaukee, LLC v. It's Just Lunch Int'l, LLC*, 2022 WL 744055, at *4 (D. Nev. Mar. 11, 2022) ("Because genuine disputes remain on some claims, I deny summary judgment on whether injunctive relief is appropriate.").

NO JS6

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:24-cv-09511-RGK | Date | September 16, 2025 |
|----------|-------------------|------|--------------------|
| Title | *Federal Trade Commission v. Seek Capital, LLC et al.* | | |

Accordingly, the Court **DENIES** the FTC's Motion for Summary Judgment of the scope of injunctive and monetary relief.

**B.   Conclusion**

For the foregoing reasons, the Court **GRANTS in part** the FTC's Motion for Summary Judgment. Specifically, the Court holds as follows:

1.  The FTC's Motion for Summary Judgment of violations of the FTCA and TSR as to misrepresentations about relationships with lenders, line of credit capabilities, financing terms, no fees until funding, and credit score impact is **GRANTED**. The FTC's Motion for Summary Judgment of violations of the FTCA and TSR as to all other grounds for misrepresentation are **DENIED**.
2.  The FTC's Motion for Summary Judgment of FTCA violations as to Defendants' billing practices related to its early termination fees and charging for certain services not provided is **GRANTED**. The FTC's Motion for Summary Judgment of FTCA violations as to all other billing practices are **DENIED**.
3.  The FTC's Motion for Summary Judgment of the CRFA violation is **GRANTED**.
4.  The FTC's Motion for Summary Judgment that Seek acted as a common enterprise is **GRANTED**.
5.  The FTC's Motion for Summary Judgment of the failure of all affirmative defenses except for the fifth affirmative defense as it relates to damages is **GRANTED**. The FTC's Motion for Summary Judgment of the failure of the fifth affirmative defense is **DENIED** as it relates to damages.
6.  The FTC's Motion for Summary Judgment that Ferman is individually liable for injunctive and monetary relief for Seek's wrongdoings is **GRANTED**.
7.  The FTC's Motion for Summary Judgment for the scope of injunctive and monetary relief is **DENIED**.

The Court now proceeds to consider Ferman's Motion for Partial Summary Judgment.

**V.   DEFENDANT FERMAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**A.   Discussion**

Ferman moves for partial summary judgment on essentially two issues: (1) whether the Court must defer to the FTC's request for relief in this case; and (2) the scope of injunctive relief.

First, Ferman asserts that the Court is not required to defer to the FTC on the scope of injunctive relief, citing to the Supreme Court's recent ruling in *Loper Bright Enters. v. Raimondo*, 603 U.S. 369,

NO JS6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:24-cv-09511-RGK | Date | September 16, 2025 |
|---|---|---|---|
| Title | *Federal Trade Commission v. Seek Capital, LLC et al.* | | |

396 (2024) for support. In its Opposition, the FTC states that *Loper Bright Enters.* is inapplicable give that it is requesting that the Court issue an injunction with an appropriate remedy pursuant to Section 13(b) of the FTCA. Additionally, the FTC confirms that it is requesting the Court to issue an injunction with an appropriate remedy under Section 13(b). Thus, there is no dispute that Section 13(b) "gives the federal courts broad authority to fashion appropriate remedies for violations of the" FTCA. *F.T.C. v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994).

Second, Ferman asserts that if injunctive relief is ordered against him, the scope should be narrower than what the FTC has requested. As explained above, genuine issues of material fact exist as to Defendants' full liabilities for the claims asserted in this action. As a result, there are genuine disputes as to the appropriate scope of relief.

**B.**    **Conclusion**

Accordingly, the Court **DENIES** Ferman's Motion for Partial Summary Judgment.

**VI.**    **CONCLUSION**

For the foregoing reasons, the Court **GRANTS in part** the FTC's Motion for Summary Judgment, and **DENIES** Ferman's Motion for Partial Summary Judgment.

Specifically, the Court holds as follows:

1. The FTC's Motion for Summary Judgment of violations of the FTCA and TSR as to misrepresentations about relationships with lenders, line of credit capabilities, financing terms, no fees until funding, and credit score impact is **GRANTED**. The FTC's Motion for Summary Judgment of violations of the FTCA and TSR as to all other grounds for misrepresentation are **DENIED**.
2. The FTC's Motion for Summary Judgment of FTCA violations as to Defendants' billing practices related to its early termination fees and charging for certain services not provided is **GRANTED**. The FTC's Motion for Summary Judgment of FTCA violations as to all other billing practices are **DENIED**.
3. The FTC's Motion for Summary Judgment of the CRFA violation is **GRANTED**.
4. The FTC's Motion for Summary Judgment that Seek acted as a common enterprise is **GRANTED**.
5. The FTC's Motion for Summary Judgment of the failure of all affirmative defenses except for the fifth affirmative defense as it relates to damages is **GRANTED**. The FTC's Motion for Summary Judgment of the failure of the fifth affirmative defense is **DENIED** as it relates to damages.

NO JS6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:24-cv-09511-RGK | Date | September 16, 2025 |
|----------|-------------------|------|--------------------|
| Title | *Federal Trade Commission v. Seek Capital, LLC et al.* | | |

6. The FTC's Motion for Summary Judgment that Ferman is individually liable for injunctive and monetary relief for Seek's wrongdoings is **GRANTED**.

7. The FTC's Motion for Summary Judgment for the scope of injunctive and monetary relief is **DENIED**.

8. Ferman's Motion for Partial Summary Judgment is **DENIED**.

**IT IS SO ORDERED.**

|  | : |
|---|---|
| Initials of Preparer | JRE/gz |

ATTACHMENT B

This content is from the eCFR and is authoritative but unofficial.

Title 16 —Commercial Practices
Chapter I —Federal Trade Commission
Subchapter C —Regulations Under Specific Acts of Congress

Part 310   Telemarketing Sales Rule
   § 310.1   Scope of regulations in this part.
   § 310.2   Definitions.
   § 310.3   Deceptive telemarketing acts or practices.
   § 310.4   Abusive telemarketing acts or practices.
   § 310.5   Recordkeeping requirements.
   § 310.6   Exemptions.
   § 310.7   Actions by states and private persons.
   § 310.8   Fee for access to the National Do Not Call Registry.
   § 310.9   Severability.

# PART 310—TELEMARKETING SALES RULE

**Authority:** 15 U.S.C. 6101-6108.

**Source:** 75 FR 48516, Aug. 10, 2010, unless otherwise noted.

## § 310.1 Scope of regulations in this part.

This part implements the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. 6101-6108, as amended.

## § 310.2 Definitions.

(a) *Acquirer* means a business organization, financial institution, or an agent of a business organization or financial institution that has authority from an organization that operates or licenses a credit card system to authorize merchants to accept, transmit, or process payment by credit card through the credit card system for money, goods or services, or anything else of value.

(b) *Attorney General* means the chief legal officer of a state.

(c) *Billing information* means any data that enables any person to access a customer's or donor's account, such as a credit card, checking, savings, share or similar account, utility bill, mortgage loan account, or debit card.

(d) *Caller identification service* means a service that allows a telephone subscriber to have the telephone number, and, where available, name of the calling party transmitted contemporaneously with the telephone call, and displayed on a device in or connected to the subscriber's telephone.

(e) *Cardholder* means a person to whom a credit card is issued or who is authorized to use a credit card on behalf of or in addition to the person to whom the credit card is issued.

(f) *Cash-to-cash money transfer* means the electronic (as defined in section 106(2) of the Electronic Signatures in Global and National Commerce Act (15 U.S.C. 7006(2)) transfer of the value of cash received from one person to another person in a different location that is sent by a money transfer provider and received in the form of cash. For purposes of this definition, *money transfer provider* means any person or financial institution that provides cash-to-cash money transfers for a person in the normal course of its business, whether or not the person holds an account with such person or financial institution. The term *cash-to-cash money transfer* includes a remittance transfer, as defined in section 919(g)(2) of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. 1693a, that is a cash-to-cash transaction; however it does not include any transaction that is:

  (1) An electronic fund transfer as defined in section 903 of the EFTA;

  (2) Covered by Regulation E, 12 CFR 1005.20, pertaining to gift cards; or

  (3) Subject to the Truth in Lending Act, 15 U.S.C. 1601 *et seq.*

(g) *Cash reload mechanism* is a device, authorization code, personal identification number, or other security measure that makes it possible for a person to convert cash into an electronic (as defined in section 106(2) of the Electronic Signatures in Global and National Commerce Act (15 U.S.C. 7006(2)) form that can be used to add funds to a general-use prepaid card, as defined in Regulation E, 12 CFR 1005.2, or an account with a payment intermediary. For purposes of this definition, a cash reload mechanism is not itself a general-use prepaid debit card or a swipe reload process or similar method in which funds are added directly onto a person's own general-use prepaid card or account with a payment intermediary.

(h) *Charitable contribution* means any donation or gift of money or any other thing of value.

(i) *Commission* means the Federal Trade Commission.

(j) *Credit* means the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment.

(k) *Credit card* means any card, plate, coupon book, or other credit device existing for the purpose of obtaining money, property, labor, or services on credit.

(l) *Credit card sales draft* means any record or evidence of a credit card transaction.

(m) *Credit card system* means any method or procedure used to process credit card transactions involving credit cards issued or licensed by the operator of that system.

(n) *Customer* means any person who is or may be required to pay for goods or services offered through telemarketing.

(o) *Debt relief service* means any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector.

(p) *Donor* means any person solicited to make a charitable contribution.

(q) **Established business relationship** means a relationship between a seller and a person based on:

   (1) The person's purchase, rental, or lease of the seller's goods or services or a financial transaction between the person and seller, within the 540 days immediately preceding the date of a telemarketing call; or

   (2) The person's inquiry or application regarding a good or service offered by the seller, within the 90 days immediately preceding the date of a telemarketing call.

(r) **Free-to-pay conversion** means, in an offer or agreement to sell or provide any goods or services, a provision under which a customer receives a product or service for free for an initial period and will incur an obligation to pay for the product or service if he or she does not take affirmative action to cancel before the end of that period.

(s) **Investment opportunity** means anything, tangible or intangible, that is offered, offered for sale, sold, or traded based wholly or in part on representations, either express or implied, about past, present, or future income, profit, or appreciation.

(t) **Material** means likely to affect a person's choice of, or conduct regarding, goods or services or a charitable contribution.

(u) **Merchant** means a person who is authorized under a written contract with an acquirer to honor or accept credit cards, or to transmit or process for payment credit card payments, for the purchase of goods or services or a charitable contribution.

(v) **Merchant agreement** means a written contract between a merchant and an acquirer to honor or accept credit cards, or to transmit or process for payment credit card payments, for the purchase of goods or services or a charitable contribution.

(w) **Negative option feature** means, in an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer.

(x) **Outbound telephone call** means a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution.

(y) **Person** means any individual, group, unincorporated association, limited or general partnership, corporation, or other business entity.

(z) **Preacquired account information** means any information that enables a seller or telemarketer to cause a charge to be placed against a customer's or donor's account without obtaining the account number directly from the customer or donor during the telemarketing transaction pursuant to which the account will be charged.

(aa) **Previous donor** means any person who has made a charitable contribution to a particular charitable organization within the 2-year period immediately preceding the date of the telemarketing call soliciting on behalf of that charitable organization.

(bb) **Prize** means anything offered, or purportedly offered, and given, or purportedly given, to a person by chance. For purposes of this definition, chance exists if a person is guaranteed to receive an item and, at the time of the offer or purported offer, the telemarketer does not identify the specific item that the person will receive.

(cc) **Prize promotion** means:

Case 2:24-cv-09511-RGK-MAA    Document 150    Filed 09/30/25    Page 47 of 64   Page
ID #:11500

(1) A sweepstakes or other game of chance; or

(2) An oral or written express or implied representation that a person has won, has been selected to receive, or may be eligible to receive a prize or purported prize.

(dd) *Remotely created payment order* means any payment instruction or order drawn on a person's account that is created by the payee or the payee's agent and deposited into or cleared through the check clearing system. The term includes, without limitation, a "remotely created check," as defined in Regulation CC, Availability of Funds and Collection of Checks, 12 CFR 229.2(fff), but does not include a payment order cleared through an Automated Clearinghouse (ACH) Network or subject to the Truth in Lending Act, 15 U.S.C. 1601 *et seq.,* and Regulation Z, 12 CFR part 1026.

(ee) *Seller* means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration.

(ff) *State* means any state of the United States, the District of Columbia, Puerto Rico, the Northern Mariana Islands, and any territory or possession of the United States.

(gg) *Technical support service* means any plan, program, software, or service that is marketed to repair, maintain, or improve the performance or security of any device on which code can be downloaded, installed, run, or otherwise used, such as a computer, smartphone, tablet, or smart home product, including any software or application run on such device. Technical support service does not include any plan, program, software, or service in which the person providing the repair, maintenance, or improvement obtains physical possession of the device being repaired.

(hh) *Telemarketer* means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor.

(ii) *Telemarketing* means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call. The term does not include the solicitation of sales through the mailing of a catalog which: contains a written description or illustration of the goods or services offered for sale; includes the business address of the seller; includes multiple pages of written material or illustrations; and has been issued not less frequently than once a year, when the person making the solicitation does not solicit customers by telephone but only receives calls initiated by customers in response to the catalog and during those calls takes orders only without further solicitation. For purposes of the previous sentence, the term "further solicitation" does not include providing the customer with information about, or attempting to sell, any other item included in the same catalog which prompted the customer's call or in a substantially similar catalog.

(jj) *Upselling* means soliciting the purchase of goods or services following an initial transaction during a single telephone call. The upsell is a separate telemarketing transaction, not a continuation of the initial transaction. An "external upsell" is a solicitation made by or on behalf of a seller different from the seller in the initial transaction, regardless of whether the initial transaction and the subsequent solicitation are made by the same telemarketer. An "internal upsell" is a solicitation made by or on behalf of the same seller as in the initial transaction, regardless of whether the initial transaction and subsequent solicitation are made by the same telemarketer.

*[75 FR 48516, Aug. 10, 2010, as amended at 80 FR 77557, Dec. 14, 2015; 89 FR 26783, Apr. 16, 2024; 89 FR 99075, Dec. 10, 2024]*

## § 310.3 Deceptive telemarketing acts or practices.

(a) *Prohibited deceptive telemarketing acts or practices.* It is a deceptive telemarketing act or practice and a violation of this part for any seller or telemarketer to engage in the following conduct:

(1) Before a customer consents to pay[1] for goods or services offered, failing to disclose truthfully, in a clear and conspicuous manner, the following material information:

(i) The total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of the sales offer;[2]

(ii) All material restrictions, limitations, or conditions to purchase, receive, or use the goods or services that are the subject of the sales offer;

(iii) If the seller has a policy of not making refunds, cancellations, exchanges, or repurchases, a statement informing the customer that this is the seller's policy; or, if the seller or telemarketer makes a representation about a refund, cancellation, exchange, or repurchase policy, a statement of all material terms and conditions of such policy;

(iv) In any prize promotion, the odds of being able to receive the prize, and, if the odds are not calculable in advance, the factors used in calculating the odds; that no purchase or payment is required to win a prize or to participate in a prize promotion and that any purchase or payment will not increase the person's chances of winning; and the no-purchase/no-payment method of participating in the prize promotion with either instructions on how to participate or an address or local or toll-free telephone number to which customers may write or call for information on how to participate;

(v) All material costs or conditions to receive or redeem a prize that is the subject of the prize promotion;

(vi) In the sale of any goods or services represented to protect, insure, or otherwise limit a customer's liability in the event of unauthorized use of the customer's credit card, the limits on a cardholder's liability for unauthorized use of a credit card pursuant to 15 U.S.C. 1643;

(vii) If the offer includes a negative option feature, all material terms and conditions of the negative option feature, including, but not limited to, the fact that the customer's account will be charged unless the customer takes an affirmative action to avoid the charge(s), the date(s) the charge(s) will be submitted for payment, and the specific steps the customer must take to avoid the charge(s); and

(viii) In the sale of any debt relief service:

[1] When a seller or telemarketer uses, or directs a customer to use, a courier to transport payment, the seller or telemarketer must make the disclosures required by § 310.3(a)(1) before sending a courier to pick up payment or authorization for payment, or directing a customer to have a courier pick up payment or authorization for payment. In the case of debt relief services, the seller or telemarketer must make the disclosures required by § 310.3(a)(1) before the consumer enrolls in an offered program.

[2] For offers of consumer credit products subject to the Truth in Lending Act, 15 U.S.C. 1601 *et seq.*, and Regulation Z, 12 CFR 226, compliance with the disclosure requirements under the Truth in Lending Act and Regulation Z shall constitute compliance with § 310.3(a)(1)(i) of this part.

(A) the amount of time necessary to achieve the represented results, and to the extent that the service may include a settlement offer to any of the customer's creditors or debt collectors, the time by which the debt relief service provider will make a bona fide settlement offer to each of them;

(B) to the extent that the service may include a settlement offer to any of the customer's creditors or debt collectors, the amount of money or the percentage of each outstanding debt that the customer must accumulate before the debt relief service provider will make a bona fide settlement offer to each of them;

(C) to the extent that any aspect of the debt relief service relies upon or results in the customer's failure to make timely payments to creditors or debt collectors, that the use of the debt relief service will likely adversely affect the customer's creditworthiness, may result in the customer being subject to collections or sued by creditors or debt collectors, and may increase the amount of money the customer owes due to the accrual of fees and interest; and

(D) to the extent that the debt relief service requests or requires the customer to place funds in an account at an insured financial institution, that the customer owns the funds held in the account, the customer may withdraw from the debt relief service at any time without penalty, and, if the customer withdraws, the customer must receive all funds in the account, other than funds earned by the debt relief service in compliance with § 310.4(a)(5)(i)(A) through (C).

(2) Misrepresenting, directly or by implication, in the sale of goods or services any of the following material information:

(i) The total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of a sales offer;

(ii) Any material restriction, limitation, or condition to purchase, receive, or use goods or services that are the subject of a sales offer;

(iii) Any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer;

(iv) Any material aspect of the nature or terms of the seller's refund, cancellation, exchange, or repurchase policies;

(v) Any material aspect of a prize promotion including, but not limited to, the odds of being able to receive a prize, the nature or value of a prize, or that a purchase or payment is required to win a prize or to participate in a prize promotion;

(vi) Any material aspect of an investment opportunity including, but not limited to, risk, liquidity, earnings potential, or profitability;

(vii) A seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity;

(viii) That any customer needs offered goods or services to provide protections a customer already has pursuant to 15 U.S.C. 1643;

(ix) Any material aspect of a negative option feature including, but not limited to, the fact that the customer's account will be charged unless the customer takes an affirmative action to avoid the charge(s), the date(s) the charge(s) will be submitted for payment, and the specific steps the customer must take to avoid the charge(s); or

(x) Any material aspect of any debt relief service, including, but not limited to, the amount of money or the percentage of the debt amount that a customer may save by using such service; the amount of time necessary to achieve the represented results; the amount of money or the percentage of each outstanding debt that the customer must accumulate before the provider of the debt relief service will initiate attempts with the customer's creditors or debt collectors or make a bona fide offer to negotiate, settle, or modify the terms of the customer's debt; the effect of the service on a customer's creditworthiness; the effect of the service on collection efforts of the customer's creditors or debt collectors; the percentage or number of customers who attain the represented results; and whether a debt relief service is offered or provided by a non-profit entity.

(3) Causing billing information to be submitted for payment, or collecting or attempting to collect payment for goods or services or a charitable contribution, directly or indirectly, without the customer's or donor's express verifiable authorization, except when the method of payment used is a credit card subject to protections of the Truth in Lending Act and Regulation Z,[3] or a debit card subject to the protections of the Electronic Fund Transfer Act and Regulation E.[4] Such authorization shall be deemed verifiable if any of the following means is employed:

(i) Express written authorization by the customer or donor, which includes the customer's or donor's signature;[5]

(ii) Express oral authorization which is audio-recorded and made available upon request to the customer or donor, and the customer's or donor's bank or other billing entity, and which evidences clearly both the customer's or donor's authorization of payment for the goods or services or charitable contribution that are the subject of the telemarketing transaction and the customer's or donor's receipt of all of the following information:

(A) An accurate description, clearly and conspicuously stated, of the goods or services or charitable contribution for which payment authorization is sought;

(B) The number of debits, charges, or payments (if more than one);

(C) The date(s) the debit(s), charge(s), or payment(s) will be submitted for payment;

(D) The amount(s) of the debit(s), charge(s), or payment(s);

(E) The customer's or donor's name;

---

[4] Electronic Fund Transfer Act, 15 U.S.C. 1693 *et seq.,* and Regulation E, 12 CFR part 205.

[3] Truth in Lending Act, 15 U.S.C. 1601 *et seq.,* and Regulation Z, 12 CFR part 226.

[5] For purposes of this part, the term "signature" shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

    (F)  The customer's or donor's billing information, identified with sufficient specificity such that the customer or donor understands what account will be used to collect payment for the goods or services or charitable contribution that are the subject of the telemarketing transaction;

    (G)  A telephone number for customer or donor inquiry that is answered during normal business hours; and

    (H)  The date of the customer's or donor's oral authorization; or

  (iii)  Written confirmation of the transaction, identified in a clear and conspicuous manner as such on the outside of the envelope, sent to the customer or donor via first class mail prior to the submission for payment of the customer's or donor's billing information, and that includes all of the information contained in §§ 310.3(a)(3)(ii)(A)-(G) and a clear and conspicuous statement of the procedures by which the customer or donor can obtain a refund from the seller or telemarketer or charitable organization in the event the confirmation is inaccurate; provided, however, that this means of authorization shall not be deemed verifiable in instances in which goods or services are offered in a transaction involving a free-to-pay conversion and preacquired account information.

  (4)  Making a false or misleading statement to induce any person to pay for goods or services or to induce a charitable contribution.

(b)  *Assisting and facilitating.* It is a deceptive telemarketing act or practice and a violation of this part for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4 of this part.

(c)  *Credit card laundering.* Except as expressly permitted by the applicable credit card system, it is a deceptive telemarketing act or practice and a violation of this part for:

  (1)  A merchant to present to or deposit into, or cause another to present to or deposit into, the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and the merchant;

  (2)  Any person to employ, solicit, or otherwise cause a merchant, or an employee, representative, or agent of the merchant, to present to or deposit into the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and the merchant; or

  (3)  Any person to obtain access to the credit card system through the use of a business relationship or an affiliation with a merchant, when such access is not authorized by the merchant agreement or the applicable credit card system.

(d)  *Prohibited deceptive acts or practices in the solicitation of charitable contributions.* It is a fraudulent charitable solicitation, a deceptive telemarketing act or practice, and a violation of this part for any telemarketer soliciting charitable contributions to misrepresent, directly or by implication, any of the following material information:

  (1)  The nature, purpose, or mission of any entity on behalf of which a charitable contribution is being requested;

  (2)  That any charitable contribution is tax deductible in whole or in part;

   (3) The purpose for which any charitable contribution will be used;

   (4) The percentage or amount of any charitable contribution that will go to a charitable organization or to any particular charitable program;

   (5) Any material aspect of a prize promotion including, but not limited to: the odds of being able to receive a prize; the nature or value of a prize; or that a charitable contribution is required to win a prize or to participate in a prize promotion; or

   (6) A charitable organization's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity.

*[75 FR 48516, Aug. 10, 2010, as amended at 80 FR 77558, Dec. 14, 2015; 89 FR 26784, 26785, Apr. 16, 2024]*

## § 310.4 Abusive telemarketing acts or practices.

   (a) ***Abusive conduct generally.*** It is an abusive telemarketing act or practice and a violation of this part for any seller or telemarketer to engage in the following conduct:

      (1) Threats, intimidation, or the use of profane or obscene language;

      (2) Requesting or receiving payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating until:

         (i) The time frame in which the seller has represented all of the goods or services will be provided to that person has expired; and

         (ii) The seller has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved. Nothing in this part should be construed to affect the requirement in the Fair Credit Reporting Act, 15 U.S.C. 1681, that a consumer report may only be obtained for a specified permissible purpose;

      (3) Requesting or receiving payment of any fee or consideration from a person for goods or services represented to recover or otherwise assist in the return of money or any other item of value paid for by, or promised to, that person in a previous transaction, until seven (7) business days after such money or other item is delivered to that person. This provision shall not apply to goods or services provided to a person by a licensed attorney;

      (4) Requesting or receiving payment of any fee or consideration in advance of obtaining a loan or other extension of credit when the seller or telemarketer has guaranteed or represented a high likelihood of success in obtaining or arranging a loan or other extension of credit for a person;

      (5)

         (i) Requesting or receiving payment of any fee or consideration for any debt relief service until and unless:

            (A) The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer;

   (B)   The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor or debt collector; and

   (C)   To the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either:

       (1)   Bears the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount. The individual debt amount and the entire debt amount are those owed at the time the debt was enrolled in the service; or

       (2)   Is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration. The percentage charged cannot change from one individual debt to another. The amount saved is the difference between the amount owed at the time the debt was enrolled in the service and the amount actually paid to satisfy the debt.

  (ii)   Nothing in § 310.4(a)(5)(i) prohibits requesting or requiring the customer to place funds in an account to be used for the debt relief provider's fees and for payments to creditors or debt collectors in connection with the renegotiation, settlement, reduction, or other alteration of the terms of payment or other terms of a debt, provided that:

   (A)   The funds are held in an account at an insured financial institution;

   (B)   The customer owns the funds held in the account and is paid accrued interest on the account, if any;

   (C)   The entity administering the account is not owned or controlled by, or in any way affiliated with, the debt relief service;

   (D)   The entity administering the account does not give or accept any money or other compensation in exchange for referrals of business involving the debt relief service; and

   (E)   The customer may withdraw from the debt relief service at any time without penalty, and must receive all funds in the account, other than funds earned by the debt relief service in compliance with § 310.4(a)(5)(i)(A) through (C), within seven (7) business days of the customer's request.

  (6)   Disclosing or receiving, for consideration, unencrypted consumer account numbers for use in telemarketing; provided, however, that this paragraph shall not apply to the disclosure or receipt of a customer's or donor's billing information to process a payment for goods or services or a charitable contribution pursuant to a transaction;

  (7)   Causing billing information to be submitted for payment, directly or indirectly, without the express informed consent of the customer or donor. In any telemarketing transaction, the seller or telemarketer must obtain the express informed consent of the customer or donor to be charged for the goods or services or charitable contribution and to be charged using the identified account. In any telemarketing transaction involving preacquired account information, the requirements in paragraphs (a)(7)(i) through (ii) of this section must be met to evidence express informed consent.

   (i)   In any telemarketing transaction involving preacquired account information and a free-to-pay conversion feature, the seller or telemarketer must:

(A) Obtain from the customer, at a minimum, the last four (4) digits of the account number to be charged;

(B) Obtain from the customer his or her express agreement to be charged for the goods or services and to be charged using the account number pursuant to paragraph (a)(7)(i)(A) of this section; and,

(C) Make and maintain an audio recording of the entire telemarketing transaction.

(ii) In any other telemarketing transaction involving preacquired account information not described in paragraph (a)(7)(i) of this section, the seller or telemarketer must:

(A) At a minimum, identify the account to be charged with sufficient specificity for the customer or donor to understand what account will be charged; and

(B) Obtain from the customer or donor his or her express agreement to be charged for the goods or services and to be charged using the account number identified pursuant to paragraph (a)(7)(ii)(A) of this section;

(8) Failing to transmit or cause to be transmitted the telephone number, and, when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service in use by a recipient of a telemarketing call; provided that it shall not be a violation to substitute (for the name and phone number used in, or billed for, making the call) the name of the seller or charitable organization on behalf of which a telemarketing call is placed, and the seller's or charitable organization's customer or donor service telephone number, which is answered during regular business hours;

(9) Creating or causing to be created, directly or indirectly, a remotely created payment order as payment for goods or services offered or sold through telemarketing or as a charitable contribution solicited or sought through telemarketing; or

(10) Accepting from a customer or donor, directly or indirectly, a cash-to-cash money transfer or cash reload mechanism as payment for goods or services offered or sold through telemarketing or as a charitable contribution solicited or sought through telemarketing.

(b) *Pattern of calls.*

(1) It is an abusive telemarketing act or practice and a violation of this part for a telemarketer to engage in, or for a seller to cause a telemarketer to engage in, the following conduct:

(i) Causing any telephone to ring, or engaging any person in telephone conversation, repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number;

(ii) Denying or interfering in any way, directly or indirectly, with a person's right to be placed on any registry of names and/or telephone numbers of persons who do not wish to receive outbound telephone calls established to comply with paragraph (b)(1)(iii)(A) of this section, including, but not limited to, harassing any person who makes such a request; hanging up on that person; failing to honor the request; requiring the person to listen to a sales pitch before accepting the request; assessing a charge or fee for honoring the request; requiring a person to call a different number to submit the request; and requiring the person to identify the seller making the call or on whose behalf the call is made;

(iii) Initiating any outbound telephone call to a person when:

(A) That person previously has stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered or made on behalf of the charitable organization for which a charitable contribution is being solicited; or

(B) That person's telephone number is on the "do-not-call" registry, maintained by the Commission, of persons who do not wish to receive outbound telephone calls to induce the purchase of goods or services unless the seller or telemarketer:

(1) Can demonstrate that the seller has obtained the express agreement, in writing, of such person to place calls to that person. Such written agreement shall clearly evidence such person's authorization that calls made by or on behalf of a specific party may be placed to that person, and shall include the telephone number to which the calls may be placed and the signature[1] of that person; or

(2) Can demonstrate that the seller has an established business relationship with such person, and that person has not stated that he or she does not wish to receive outbound telephone calls under paragraph (b)(1)(iii)(A) of this section; or

(iv) Abandoning any outbound telephone call. An outbound telephone call is "abandoned" under this section if a person answers it and the telemarketer does not connect the call to a sales representative within two (2) seconds of the person's completed greeting.

(v) Initiating any outbound telephone call that delivers a prerecorded message, other than a prerecorded message permitted for compliance with the call abandonment safe harbor in § 310.4(b)(4)(iii), unless:

(A) In any such call to induce the purchase of any good or service, the seller has obtained from the recipient of the call an express agreement, in writing, that:

(i) The seller obtained only after a clear and conspicuous disclosure that the purpose of the agreement is to authorize the seller to place prerecorded calls to such person;

(ii) The seller obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service;

(iii) Evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of a specific seller; and

(iv) Includes such person's telephone number and signature;[2] and

---

[1] For purposes of this part, the term "signature" shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

[2] For purposes of this part, the term "signature" shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

(B) In any such call to induce the purchase of any good or service, or to induce a charitable contribution from a member of, or previous donor to, a non-profit charitable organization on whose behalf the call is made, the seller or telemarketer:

(i) Allows the telephone to ring for at least fifteen (15) seconds or four (4) rings before disconnecting an unanswered call; and

(ii) Within two (2) seconds after the completed greeting of the person called, plays a prerecorded message that promptly provides the disclosures required by § 310.4(d) or (e), followed immediately by a disclosure of one or both of the following:

(A) In the case of a call that could be answered in person by a consumer, that the person called can use an automated interactive voice and/or keypress-activated opt-out mechanism to assert a Do Not Call request pursuant to § 310.4(b)(1)(iii)(A) at any time during the message. The mechanism must:

(1) Automatically add the number called to the seller's entity-specific Do Not Call list;

(2) Once invoked, immediately disconnect the call; and

(3) Be available for use at any time during the message; and

(B) In the case of a call that could be answered by an answering machine or voicemail service, that the person called can use a toll-free telephone number to assert a Do Not Call request pursuant to § 310.4(b)(1)(iii)(A). The number provided must connect directly to an automated interactive voice or keypress-activated opt-out mechanism that:

(1) Automatically adds the number called to the seller's entity-specific Do Not Call list;

(2) Immediately thereafter disconnects the call; and

(3) Is accessible at any time throughout the duration of the telemarketing campaign; and

(iii) Complies with all other requirements of this part and other applicable federal and state laws.

(C) Any call that complies with all applicable requirements of this paragraph (v) shall not be deemed to violate § 310.4(b)(1)(iv) of this part.

(D) This paragraph (v) shall not apply to any outbound telephone call that delivers a prerecorded healthcare message made by, or on behalf of, a covered entity or its business associate, as those terms are defined in the HIPAA Privacy Rule, 45 CFR 160.103. P>(2) It is an abusive telemarketing act or practice and a violation of this part for any person to sell, rent, lease, purchase, or use any list established to comply with § 310.4(b)(1)(iii)(A) or § 310.5, or maintained by the Commission pursuant to § 310.4(b)(1)(iii)(B), for any purpose except compliance with the provisions of this part or otherwise to prevent telephone calls to telephone numbers on such lists.

(3) A seller or telemarketer will not be liable for violating § 310.4(b)(1)(ii) and (iii) if it can demonstrate that, as part of the seller's or telemarketer's routine business practice:

(i) It has established and implemented written procedures to comply with § 310.4(b)(1)(ii) and (iii);

(ii) It has trained its personnel, and any entity assisting in its compliance, in the procedures established pursuant to § 310.4(b)(3)(i);

(iii) The seller, or a telemarketer or another person acting on behalf of the seller or charitable organization, has maintained and recorded a list of telephone numbers the seller or charitable organization may not contact, in compliance with § 310.4(b)(1)(iii)(A);

(iv) The seller or a telemarketer uses a process to prevent telemarketing to any telephone number on any list established pursuant to § 310.4(b)(3)(iii) or 310.4(b)(1)(iii)(B), employing a version of the "do-not-call" registry obtained from the Commission no more than thirty-one (31) days prior to the date any call is made, and maintains records documenting this process;

(v) The seller or a telemarketer or another person acting on behalf of the seller or charitable organization, monitors and enforces compliance with the procedures established pursuant to § 310.4(b)(3)(i); and

(vi) Any subsequent call otherwise violating paragraph (b)(1)(ii) or (iii) of this section is the result of error and not of failure to obtain any information necessary to comply with a request pursuant to paragraph (b)(1)(iii)(A) of this section not to receive further calls by or on behalf of a seller or charitable organization.

(4) A seller or telemarketer will not be liable for violating § 310.4(b)(1)(iv) if:

(i) The seller or telemarketer employs technology that ensures abandonment of no more than three (3) percent of all calls answered by a person, measured over the duration of a single calling campaign, if less than 30 days, or separately over each successive 30-day period or portion thereof that the campaign continues.

(ii) The seller or telemarketer, for each telemarketing call placed, allows the telephone to ring for at least fifteen (15) seconds or four (4) rings before disconnecting an unanswered call;

(iii) Whenever a sales representative is not available to speak with the person answering the call within two (2) seconds after the person's completed greeting, the seller or telemarketer promptly plays a recorded message that states the name and telephone number of the seller on whose behalf the call was placed[3] ; and

(iv) The seller or telemarketer, in accordance with § 310.5(b)-(d), retains records establishing compliance with § 310.4(b)(4)(i)-(iii).

(c) *Calling time restrictions.* Without the prior consent of a person, it is an abusive telemarketing act or practice and a violation of this part for a telemarketer to engage in outbound telephone calls to a person's residence at any time other than between 8:00 a.m. and 9:00 p.m. local time at the called person's location.

(d) *Required oral disclosures in the sale of goods or services.* It is an abusive telemarketing act or practice and a violation of this part for a telemarketer in an outbound telephone call or internal or external upsell to induce the purchase of goods or services to fail to disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call, the following information:

(1) The identity of the seller;

(2) That the purpose of the call is to sell goods or services;

---

[3] This provision does not affect any seller's or telemarketer's obligation to comply with relevant state and federal laws, including but not limited to the TCPA, 47 U.S.C. 227, and 47 CFR part 64.1200.

(3)  The nature of the goods or services; and

(4)  That no purchase or payment is necessary to be able to win a prize or participate in a prize promotion if a prize promotion is offered and that any purchase or payment will not increase the person's chances of winning. This disclosure must be made before or in conjunction with the description of the prize to the person called. If requested by that person, the telemarketer must disclose the no-purchase/no-payment entry method for the prize promotion; provided, however, that, in any internal upsell for the sale of goods or services, the seller or telemarketer must provide the disclosures listed in this section only to the extent that the information in the upsell differs from the disclosures provided in the initial telemarketing transaction.

(e)  *Required oral disclosures in charitable solicitations.* It is an abusive telemarketing act or practice and a violation of this part for a telemarketer, in an outbound telephone call to induce a charitable contribution, to fail to disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call, the following information:

(1)  The identity of the charitable organization on behalf of which the request is being made; and

(2)  That the purpose of the call is to solicit a charitable contribution.

[75 FR 48516, Aug. 10, 2010, as amended at 76 FR 58716, Sept. 22, 2011; 80 FR 77559, Dec. 14, 2015; 89 FR 26784, 26785, Apr. 16, 2024]

## § 310.5 Recordkeeping requirements.

(a)  Any seller or telemarketer must keep, for a period of 5 years from the date the record is produced unless specified otherwise, the following records relating to its telemarketing activities:

(1)  A copy of each substantially different advertising, brochure, telemarketing script, and promotional material, and a copy of each unique prerecorded message. Such records must be kept for a period of 5 years from the date that they are no longer used in telemarketing;

(2)  A record of each telemarketing call, which must include:

(i)  The telemarketer that placed or received the call;

(ii)  The seller or person for which the telemarketing call is placed or received;

(iii)  The good, service, or charitable purpose that is the subject of the telemarketing call;

(iv)  Whether the telemarketing call is to an individual consumer or a business consumer;

(v)  Whether the telemarketing call is an outbound telephone call;

(vi)  Whether the telemarketing call utilizes a prerecorded message;

(vii)  The calling number, called number, date, time, and duration of the telemarketing call;

(viii)  The telemarketing script(s) and prerecorded message, if any, used during the call;

(ix)  The caller identification telephone number, and if it is transmitted, the caller identification name that is transmitted in an outbound telephone call to the recipient of the call, and any contracts or other proof of authorization for the telemarketer to use that telephone number and name, and the time period for which such authorization or contract applies; and

(x) The disposition of the call, including but not limited to, whether the call was answered, connected, dropped, or transferred. If the call was transferred, the record must also include the telephone number or IP address that the call was transferred to as well as the company name, if the call was transferred to a company different from the seller or telemarketer that placed the call; provided, however, that for calls that an individual telemarketer makes by manually entering a single telephone number to initiate the call to that number, a seller or telemarketer need not retain the records specified in paragraphs (a)(2)(vii) and (a)(2)(x) of this section.

(3) For each prize recipient, a record of the name, last known telephone number, and last known physical or email address of that prize recipient, and the prize awarded for prizes that are represented, directly or by implication, to have a value of $25.00 or more;

(4) For each customer, a record of the name, last known telephone number, and last known physical or email address of that customer, the goods or services purchased, the date such goods or services were purchased, the date such goods or services were shipped or provided, and the amount paid by the customer for the goods or services;[1]

(5) For each person with whom a seller intends to assert it has an established business relationship under § 310.2(q)(2), a record of the name and last known telephone number of that person, the date that person submitted an inquiry or application regarding the seller's goods or services, and the goods or services inquired about;

(6) For each person that a telemarketer intends to assert is a previous donor to a particular charitable organization under § 310.2(aa), a record of the name and last known telephone number of that person, and the last date that person donated to that particular charitable organization;

(7) For each current or former employee directly involved in telephone sales or solicitations, a record of the name, any fictitious name used, the last known home address and telephone number, and the job title(s) of that employee; provided, however, that if the seller or telemarketer permits fictitious names to be used by employees, each fictitious name must be traceable to only one specific employee;

(8) All verifiable authorizations or records of express informed consent or express agreement (collectively, "Consent") required to be provided or received under this part. A complete record of Consent includes the following:

(i) The name and telephone number of the person providing Consent;

(ii) A copy of the request for Consent in the same manner and format in which it was presented to the person providing Consent;

(iii) The purpose for which Consent is requested and given;

(iv) A copy of the Consent provided;

(v) The date Consent was given; and

---

[1] For offers of consumer credit products subject to the Truth in Lending Act, 15 U.S.C. 1601 *et seq.*, and Regulation Z, 12 CFR pt. 226, compliance with the recordkeeping requirements under the Truth in Lending Act, and Regulation Z, will constitute compliance with § 310.5(a)(4) of this part.

(vi) For the copy of Consent provided under § 310.3(a)(3), § 310.4(a)(7), § 310.4(b)(1)(iii)(B)(*1*), or § 310.4(b)(1)(v)(A), a complete record must also include all information specified in those respective sections of this part;

(9) A record of each service provider a telemarketer used to deliver an outbound telephone call to a person on behalf of a seller for each good or service the seller offers for sale through telemarketing. For each such service provider, a complete record includes the contract for the service provided, the date the contract was signed, and the time period the contract is in effect. Such contracts must be kept for 5 years from the date the contract expires;

(10) A record of each person who has stated she does not wish to receive any outbound telephone calls made on behalf of a seller or charitable organization pursuant to § 310.4(b)(1)(iii)(A) including: the name of the person, the telephone number(s) associated with the request, the seller or charitable organization from which the person does not wish to receive calls, the telemarketer that called the person, the date the person requested that she cease receiving such calls, and the goods or services the seller was offering for sale or the charitable purpose for which a charitable contribution was being solicited; and

(11) A record of which version of the Commission's "do-not-call" registry was used to ensure compliance with § 310.4(b)(1)(iii)(B). Such record must include:

(i) The name of the entity which accessed the registry;

(ii) The date the "do-not-call" registry was accessed;

(iii) The subscription account number that was used to access the registry; and

(iv) The telemarketing campaign for which it was accessed.

(b) A seller or telemarketer may keep the records required by paragraph (a) of this section in the same manner, format, or place as they keep such records in the ordinary course of business. The format for records required by paragraph (a)(2)(vii) of this section, and any other records that include a time or telephone number, must also comply with the following:

(1) The format for domestic telephone numbers must comport with the North American Numbering plan;

(2) The format for international telephone numbers must comport with the standard established in the International Telecommunications Union's Recommendation ITU-T E.164: Series E: Overall Network Operation, Telephone Service, Service Operation and Human Factors, published 11/2010 (incorporated by reference, see paragraph (g)(1) of this section);

(3) The time and duration of a call must be kept to the closest second; and

(4) Time must be recorded in Coordinated Universal Time (UTC).

(c) Failure to keep each record required by paragraph (a) of this section in a complete and accurate manner, and in compliance with paragraph (b) of this section, as applicable, is a violation of this part.

(d) For records kept pursuant to paragraph (a)(2) of this section, the seller or telemarketer will not be liable for failure to keep complete and accurate records pursuant to this part if it can demonstrate, with documentation, that as part of its routine business practice:

(1) It has established and implemented procedures to ensure completeness and accuracy of its records;

    (2)  It has trained its personnel, and any entity assisting it in its compliance, in such procedures;

    (3)  It monitors compliance with and enforces such procedures, and maintains records documenting such monitoring and enforcement; and

    (4)  Any failure to keep complete and accurate records was temporary, due to inadvertent error, and corrected within 30 days of discovery.

(e)  The seller and the telemarketer calling on behalf of the seller may, by written agreement, allocate responsibility between themselves for the recordkeeping required by this section. When a seller and telemarketer have entered into such an agreement, the terms of that agreement will govern, and the seller or telemarketer, as the case may be, need not keep records that duplicate those of the other. If by written agreement the telemarketer bears the responsibility for the recordkeeping requirements of this section, the seller must establish and implement practices and procedures to ensure the telemarketer is complying with the requirements of this section. These practices and procedures include retaining access to any record the telemarketer creates under this section on the seller's behalf. If the agreement is unclear as to who must maintain any required record(s), or if no such agreement exists, both the telemarketer and the seller are responsible for complying with this section.

(f)  In the event of any dissolution or termination of the seller's or telemarketer's business, the principal of that seller or telemarketer must maintain all records required under this section. In the event of any sale, assignment, or other change in ownership of the seller's or telemarketer's business, the successor business must maintain all records required under this section.

(g)  The material required in this section is incorporated by reference into this section with the approval of the Director of the Federal Register under 5 U.S.C. 552(a) and 1 CFR part 51. All approved material is available for inspection at the Federal Trade Commission (FTC) and at the National Archives and Records Administration (NARA). Contact FTC at: FTC Library, (202) 326-2395, Federal Trade Commission, Room H-630, 600 Pennsylvania Avenue NW, Washington, DC 20580, or by email at *Library@ftc.gov*. For information on the availability of this material at NARA, email *fr.inspection@nara.gov* or go to *www.archives.gov/federal-register/cfr/ibr-locations.html*. It is available from: The International Telecommunications Union, Telecommunications Standardization Bureau, Place des Nations, CH-1211 Geneva 20; (+41 22 730 5852); *https://www.itu.int/en/pages/default.aspx*.

    (1)  Recommendation ITU-T E.164: Series E: Overall Network Operation, Telephone Service, Service Operation and Human Factors, published 11/2010.

    (2)  [Reserved]

*[89 FR 26784, Apr. 16, 2024]*

## § 310.6 Exemptions.

(a)  Solicitations to induce charitable contributions via outbound telephone calls are not covered by § 310.4(b)(1)(iii)(B) of this part.

(b)  The following acts or practices are exempt from this part:

    (1)  The sale of pay-per-call services subject to the Commission's Rule entitled "Trade Regulation Rule Pursuant to the Telephone Disclosure and Dispute Resolution Act of 1992," 16 CFR part 308, *provided,* however, that this exemption does not apply to the requirements of § 310.4(a)(1), (a)(8), (b), and (c);

(2)  The sale of franchises subject to the Commission's Rule entitled "Disclosure Requirements and Prohibitions Concerning Franchising," ("Franchise Rule") 16 CFR part 436, and the sale of business opportunities subject to the Commission's Rule entitled "Disclosure Requirements and Prohibitions Concerning Business Opportunities," ("Business Opportunity Rule") 16 CFR part 437, *provided,* however, that this exemption does not apply to the requirements of § 310.4(a)(1), (a)(8), (b), and (c);

(3)  Telephone calls in which the sale of goods or services or charitable solicitation is not completed, and payment or authorization of payment is not required, until after a face-to-face sales or donation presentation by the seller or charitable organization, *provided,* however, that this exemption does not apply to the requirements of § 310.4(a)(1), (a)(8), (b), and (c);

(4)  Telephone calls initiated by a customer or donor that are not the result of any solicitation by a seller, charitable organization, or telemarketer, *provided,* however, that this exemption does not apply to any instances of upselling included in such telephone calls;

(5)  Telephone calls initiated by a customer or donor in response to an advertisement through any medium, other than direct mail solicitation, *provided,* however, that this exemption does not apply to:

    (i)  Calls initiated by a customer or donor in response to an advertisement relating to investment opportunities, debt relief services, technical support services, business opportunities other than business arrangements covered by the Franchise Rule or Business Opportunity Rule, or advertisements involving offers for goods or services described in § 310.3(a)(1)(vi) or § 310.4(a)(2) through (4);

    (ii)  The requirements of § 310.4(a)(9) or (10); or

    (iii)  Any instances of upselling included in such telephone calls;

(6)  Telephone calls initiated by a customer or donor in response to a direct mail solicitation, including solicitations via the U.S. Postal Service, facsimile transmission, electronic mail, and other similar methods of delivery in which a solicitation is directed to specific address(es) or person(s), that clearly, conspicuously, and truthfully discloses all material information listed in § 310.3(a)(1), for any goods or services offered in the direct mail solicitation, and that contains no material misrepresentation regarding any item contained in § 310.3(d) for any requested charitable contribution; *provided,* however, that this exemption does not apply to:

    (i)  Calls initiated by a customer in response to a direct mail solicitation relating to prize promotions, investment opportunities, debt relief services, technical support services, business opportunities other than business arrangements covered by the Franchise Rule or Business Opportunity Rule, or goods or services described in § 310.3(a)(1)(vi) or § 310.4(a)(2) through (4);

    (ii)  The requirements of § 310.4(a)(9) or (10); or

    (iii)  Any instances of upselling included in such telephone calls; and

(7)  Telephone calls between a telemarketer and any business to induce the purchase of goods or services or a charitable contribution by the business, *provided,* however that this exemption does not apply to:

    (i)  The requirements of § 310.3(a)(2) and(4); or

(ii) Calls to induce the retail sale of nondurable office or cleaning supplies; *provided,* however, that §§ 310.4(b)(1)(iii)(B) and 310.5 shall not apply to sellers or telemarketers of nondurable office or cleaning supplies.

*[75 FR 48516, Aug. 10, 2010, as amended at 80 FR 77559, Dec. 14, 2015; 89 FR 26785, Apr. 16, 2024; 89 FR 99075, Dec. 10, 2024]*

## § 310.7 Actions by states and private persons.

(a) Any attorney general or other officer of a State authorized by the State to bring an action under the Telemarketing and Consumer Fraud and Abuse Prevention Act, and any private person who brings an action under that Act, must serve written notice of its action on the Commission, if feasible, prior to its initiating an action under this part. The notice must be sent to the Office of the Director, Bureau of Consumer Protection, Federal Trade Commission, Washington, DC 20580, at *tsrnotice@ftc.gov* and must include a copy of the State's or private person's complaint and any other pleadings to be filed with the court. If prior notice is not feasible, the State or private person must serve the Commission with the required notice immediately upon instituting its action.

(b) Nothing contained in this Section shall prohibit any attorney general or other authorized state official from proceeding in state court on the basis of an alleged violation of any civil or criminal statute of such state.

*[75 FR 48516, Aug. 10, 2010, as amended at 89 FR 26785, Apr. 16, 2024]*

## § 310.8 Fee for access to the National Do Not Call Registry.

Link to an amendment published at 90 FR 41778, Aug. 27, 2025.

The effective date of this amendment was corrected to read Oct. 1, 2025, at 90 FR 42812, Sept. 5, 2025.

(a) It is a violation of this part for any seller to initiate, or cause any telemarketer to initiate, an outbound telephone call to any person whose telephone number is within a given area code unless such seller, either directly or through another person, first has paid the annual fee, required by § 310.8(c), for access to telephone numbers within that area code that are included in the National Do Not Call Registry maintained by the Commission under § 310.4(b)(1)(iii)(B); provided, however, that such payment is not necessary if the seller initiates, or causes a telemarketer to initiate, calls solely to persons pursuant to §§ 310.4(b)(1)(iii)(B)(i) or (ii), and the seller does not access the National Do Not Call Registry for any other purpose.

(b) It is a violation of this part for any telemarketer, on behalf of any seller, to initiate an outbound telephone call to any person whose telephone number is within a given area code unless that seller, either directly or through another person, first has paid the annual fee, required by § 310.8(c), for access to the telephone numbers within that area code that are included in the National Do Not Call Registry; provided, however, that such payment is not necessary if the seller initiates, or causes a telemarketer to initiate, calls solely to persons pursuant to §§ 310.4(b)(1)(iii)(B)(i) or (ii), and the seller does not access the National Do Not Call Registry for any other purpose.

Case 2:24-cv-09511-RGK-MAA   Document 150   Filed 09/30/25   Page 64 of 64   Page ID #:11517

(c)   The annual fee, which must be paid by any person prior to obtaining access to the National Do Not Call Registry, is $80 for each area code of data accessed, up to a maximum of $22,038; *provided,* however, that there shall be no charge to any person for accessing the first five area codes of data, and *provided further,* that there shall be no charge to any person engaging in or causing others to engage in outbound telephone calls to consumers and who is accessing area codes of data in the National Do Not Call Registry if the person is permitted to access, but is not required to access, the National Do Not Call Registry under 47 CFR 64.1200, or any other Federal regulation or law. No person may participate in any arrangement to share the cost of accessing the National Do Not Call Registry, including any arrangement with any telemarketer or service provider to divide the costs to access the registry among various clients of that telemarketer or service provider.

(d)   Each person who pays, either directly or through another person, the annual fee set forth in paragraph (c) of this section, each person excepted under paragraph (c) from paying the annual fee, and each person excepted from paying an annual fee under § 310.4(b)(1)(iii)(B), will be provided a unique account number that will allow that person to access the registry data for the selected area codes at any time for the twelve month period beginning on the first day of the month in which the person paid the fee ("the annual period"). To obtain access to additional area codes of data during the first six months of the annual period, each person required to pay the fee under paragraph (c) of this section must first pay $80 for each additional area code of data not initially selected. To obtain access to additional area codes of data during the second six months of the annual period, each person required to pay the fee under paragraph (c) of this section must first pay $40 for each additional area code of data not initially selected. The payment of the additional fee will permit the person to access the additional area codes of data for the remainder of the annual period.

(e)   Access to the National Do Not Call Registry is limited to telemarketers, sellers, others engaged in or causing others to engage in telephone calls to consumers, service providers acting on behalf of such persons, and any government agency that has law enforcement authority. Prior to accessing the National Do Not Call Registry, a person must provide the identifying information required by the operator of the registry to collect the fee, and must certify, under penalty of law, that the person is accessing the registry solely to comply with the provisions of this part or to otherwise prevent telephone calls to telephone numbers on the registry. If the person is accessing the registry on behalf of sellers, that person also must identify each of the sellers on whose behalf it is accessing the registry, must provide each seller's unique account number for access to the national registry, and must certify, under penalty of law, that the sellers will be using the information gathered from the registry solely to comply with the provisions of this part or otherwise to prevent telephone calls to telephone numbers on the registry.

*[75 FR 48516, Aug. 10, 2010; 75 FR 51934, Aug. 24, 2010, as amended at 77 FR 51697, Aug. 27, 2012; 78 FR 53643, Aug. 30, 2013; 79 FR 51478, Aug. 29, 2014; 80 FR 77560, Dec. 14, 2016; 81 FR 59845, Aug. 31, 2016; 82 FR 39534, Aug. 21, 2017; 83 FR 46640, Sept. 14, 2018; 84 FR 44687, Aug. 27, 2019; 85 FR 62597, Oct. 5, 2020; 86 FR 48301, Aug. 30, 2021; 87 FR 53373, Aug. 31, 2022; 88 FR 57334, Aug. 23, 2023; 89 FR 26785, Apr. 16, 2024; 89 FR 70095, Aug. 29, 2024]*

## § 310.9 Severability.

The provisions of this part are separate and severable from one another. If any provision is stayed or determined to be invalid, it is the Commission's intention that the remaining provisions shall continue in effect.

*[75 FR 48516, Aug. 10, 2010, as amended at 89 FR 26785, Apr. 16, 2024]*